THE INDEPENDENT ELECTRICIANS AND ELECTRICAL CONTRACTORS' ASSOCIATION OF THE STATE OF NEW JERSEY, THEODORE E. KRAINSKI, AND WILLIAM BOJKO, PLAINTIFFS-APPELLANTS, v. NEW JERSEY BOARD OF EXAMINERS OF ELECTRICAL CONTRACTORS, DEFENDANT-RESPONDENT.

Argued September 13 and 26, 1966—Decided January 23, 1967.

414

*Mr. Leonard Etz* argued the cause for appellants (*Messrs. Berman & Etz,* attorneys; *Mr. Ronald Berman* on the brief).

*Mr. Richard Newman,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Avrom J. Gold,* Assistant Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

HALL, J. This declaratory judgment action seeks to strike down an occupational licensing statute, The Electrical Contractors Licensing Act of 1962 (*N. J. S. A.* 45:5A–1 *et seq.; L.* 1962, *c.* 162, as amended by *L.* 1962, *c.* 185), as unconstitutional on substantive due process and equal protection grounds under both the federal and state constitutions. The trial judge held the act to be valid, finding, with some misgivings, that shortcomings in the statute did not attain constitutional dimensions. The plaintiffs' appeal was certified on our own motion before argument in the Appellate Division. *R. R.* 1:10–1(a).

Plaintiffs are a trade association and two individuals, representing small electrical contracting businesses and those engaged in the field on a part-time basis. The individuals also sue as taxpayers. They claim to be adversely affected economically by the legislation and further broadly challenge it from the public interest standpoint. The essence of the due process attack is that, conceding the right of the state under the police power to license and assure the competency of electri-

cians because of danger to life and property from faulty electrical work, this statutory scheme is not designed for that purpose and bears no sufficient rational relation to the meeting of that evil. Conversely, they urge that the legislation is really intended only for the protection of the private interests of other segments of the electrical contracting industry, particularly to bring about a virtual monopoly in favor of those who were full-time electrical contractors at the time of the passage of the act. Their equal protection contentions also derive from the latter position as well as from features of the licensing scheme claimed to discriminate unlawfully in favor of contracting enterprises employing many electricians and against small businesses in which all electrical work is done by the owner or owners.

The defendant Board, which is the licensing and administrative agency created by the statute, supports the legislation on a claim of its "clear and obvious purpose * * * that electrical contractors shall be competent and qualified to perform and supervise the various phases of electrical contracting work," presumably from the public safety viewpoint, and that it provides a sufficiently direct and reasonable means to that end. It also suggested a further basis of validity at oral argument, although the point is not discussed in the briefs and was not urged below, in the fact that the statute substitutes a state-wide license for the burden of local ordinances of the same general type which previously existed in a number of municipalities requiring a separate examination and license, with substantial fees, before an electrical contractor could do any business in that municipality.

Plaintiffs' challenge is grounded essentially on the face of the act, and the defense similarly oriented, with heavy reliance on the presumption of validity. Practically no meaningful evidence was introduced on the vital questions involved.

The scheme of the act, as the statutory title indicates, is clearly to regulate the business of electrical contracting for hire and not to qualify and license the individual master or journeyman electricians who actually supervise or do electrical

work. Also, there is no requirement for governmental inspection of electrical work. "Electrical contractor" is defined as "* * * a person [which term includes individual, firm, corporation or other legal entity, *N. J. S. A.* 45:5A-2(e)] who engages in the business of contracting to install, erect, repair or alter electrical equipment for the generation, transmission or utilization of electrical energy * * *" *N. J. S. A.* 45:5A-2(d).

Licensure has a double aspect, spelled out in *N. J. S. A.* 45:5A-9(a). First, before the contracting business may be engaged in for hire, a "business permit" must be obtained by the owning entity—whether that entity be an individual proprietor, a partnership or a corporation. This permit is issued by the Board for a two-year period. In addition, under *N. J. S. A.* 45:5A-19 the entity must post a $1,000 surety bond in favor of the State every two years, "conditioned on the faithful performance of the provisions of this act." The second aspect, and the prerequisite to the issuance of the business permit, is the securing of a "license" from the Board by some individual—proprietor, partner, corporate officer or any employee of the owning entity—"* * * who is or will be actively engaged in the business for which a business permit is sought * * *." The statute contains no definition of "actively engaged" and no requirement on its face that the licensed individual perform, supervise or inspect the electrical work done by the business. One license is sufficient to qualify the entity to receive a business permit and engage in business, no matter how many electrical workmen it may employ to do its work or what the degree of their competence may be. On the other hand, the owner of a small business who performs all or substantially all of the work himself must not only be licensed, but also must obtain a business permit before he may pursue his enterprise. This situation forms the principal basis of plaintiffs' claim of unlawful discrimination. As they point out, similar patterns have been held to violate equal protection in some cases. See, *e g., State ex rel. Winkler v. Benzenberg,* 101 *Wis.* 172, 76 *N. W.* 345 (*Sup. Ct.* 1898).

In view of our present disposition of the case, however, we need not consider the contention at this time.

The passing of an examination is required to obtain a license, unless the applicant came within the provisions of the "grandfather clause." The statute directs that the examination "shall be so designed as to establish the competence and qualification of the applicant to perform and supervise the various phases of electrical contracting work," *N. J. S. A.* 45:5A–9(b), and its "scope * * * shall cover such matters as the provisions of nationally recognized electrical installation safety standards and the theoretical and practical application of the same encountered in electrical work," *N. J. S. A.* 45:5A–12.

One qualifies to take the test by having been either "employed or engaged in the business of electrical construction and installation,"—not necessarily in an electrical contracting business—or by having equivalent experience or training for not less than five years preceding the application. *N. J. S. A.* 45:5A–9(b). Licensure without examination under the "grandfather clause" was available, however, to those individuals applying before July 1, 1963 (a little over six months after the December 7, 1962 effective date of the amended statute) who had been employed or engaged in the electrical contracting business for at least six years prior to the effective date of the statute, whose "principal business" had been that of electrical contractor for at least two years preceding the application, and who furnished satisfactory proof of fitness to engage in the contracting business in the nature of a description of experience therein and of representative electrical contracts performed. *N. J. S. A.* 45:5A–10. The "principal business" requirement has been held to mean that electrical contracting must have been "the applicant's primary full-time occupation." *Henderson v. New Jersey Board of Examiners of Electrical Contractors,* 85 *N. J. Super.* 509, 516 (*App. Div.* 1964), certif. denied 44 *N. J.* 399 (1965).

The upshot of this alternative licensing system is that the man who had been associated with an existing electrical con-

tracting business for six years and engaged for two years as the sole proprietor, a partner or a corporate officer or manager thereof as his full-time business received a contractor's license practically automatically, on the sole basis of which a permit was issued qualifying the enterprise to do business, without any test or proof of competency of anyone connected with the business to perform or supervise electrical work from the public safety standpoint. Experience as a business entrepreneur was substituted. Contrariwise, an electrician who had been merely an employee or a contractor engaged in the business only part time, even though entirely competent, must establish his qualifications by examination before he may enter or continue in the contracting business. The practical effect of this distinction is that 80% of the 3,395 individuals presently holding licenses under the act received them through the "grandfather clause" and two-thirds of those taking the examination in the first year of the Board's existence and three-quarters in the second year failed the test.

The prescribed fees are substantial. The initial individual license carries a charge of $150 and each biennial renewal, one of $50. The original business permit costs $25 and the renewal thereof the same amount. *N. J. S. A.* 45:5A–13. The cost to each contracting business, whether it be an individual proprietorship where the owner is the sole electrician or a large corporate enterprise employing many artisans, is the same—$175 at inception (plus the $25 examination fee, imposed pursuant to *N. J. S. A.* 45:5A–9(c), if the individual licensee has not qualified under the "grandfather clause") and $75 every second year thereafter, plus the premium on the surety bond. In the Board's first fiscal year, when the "grandfather clause" was utilizable, fees received totalled about $630,000, with the cost of administering the act only one-tenth of that sum, and in the second year, about $330,000, with administration costs requiring only about one-fifth thereof.

Many kinds of electrical work are exempted from the definition of the business of electrical contracting, and so from

any of the requirements of the act, by reason either of the facility on which the work is performed or the nature of the enterprise or agency by or for whom it is done, even though the public safety interest would seem equally important therein. Included in the first category, *inter alia,* is work in mines and on railway cars, elevators, and municipal and public electrical and communications utilities. Within the second classification are repair and maintenance work performed on property occupied by a firm or corporation by journeymen electrician employees (although the act contains no definition or method of qualification thereof) and installation, repair and maintenance work performed by regular employees (whether they be trained electricians or not) of the State or any political subdivision. *N. J. S. A.* 45:5A–18.

■■ Overall, this statute follows the quite typical pattern of occupational licensing acts. Our own research into the legislative history, including that relating to earlier abortive efforts in the same direction, shows without question that the initiative for the legislation came, as it generally does with such statutes, from the involved industry itself, or at least certain segments of it, and not by reason of public opinion or demand. It also is inferable that advancement of any public interest was not the primary thought behind the effort, if, indeed, it played a real part at all. The act is further typical of "guild" legislation, restrictive of competition, in providing that the examining and administering board comprise persons engaged in or associated with the trade or business being regulated (except for one public member out of seven here) and in distinctly favoring those engaged therein at the time of enactment through a "grandfather" privilege and by the imposition of at least burdensome requirements on people desiring to enter the field. Indeed, this very litigation was instituted by a dissatisfied element of the industry essentially to further its own particular interest. All these aspects certainly give strong support to the view that an intent behind the statute was economically to benefit the electrical contracting business as a whole, or at least some segments of it, with-

out regard to the effect on the public. It is elementary that the police power is not invocable for the economic protection alone of particular individuals or groups and if the dominant purpose be the advancement of private interests under the guise of the general welfare, there is a perversion of the power. *Reingold v. Harper,* 6 *N. J.* 182, 192 (1951). The same case makes it clear, however, that if there appears an evil to the public health, safety or welfare which a statute can be considered to meet, and the means to the end are reasonable, within the limits of judicial review, the legislative decision represented by the enactment will be upheld although private interests are incidentally rather than dominantly served. Private interest aspects as strong as they seem to be here will be an important consideration in the total evaluation.

Further in this connection, the legislative history makes it plain that the expressed principal reason long advanced by those in the industry seeking legislation to create a state-wide licensing system for electrical contracting businesses was to do away with the burden of separate municipal licenses required by local ordinances in a number of municipalities before a contractor could do any work therein. (This is accomplished by the statute under review. *N. J. S. A.* 45:5A–17.) The statement of purpose attached to the first bill introduced in the legislature expressly so stated. 1954 *Assembly Bill No.* 223. From information, admittedly incomplete, in part furnished by the Board since the argument and in part obtained by our own investigation, it appears that prior to the passage of this act, at least 25 municipalities, including many of the larger cities, had adopted such ordinances. The vast majority licensed electrical contracting businesses, as in the instant statute. A few, however, appear to have licensed master and journeymen electricians rather than contracting enterprises. Most required their own local examination to test competency in some respect. All imposed fees, many of which were even larger than those prescribed in the law before us. At least one also required a *bona fide* place of business within the

municipality as a prerequisite to application for a license.[1] The result unquestionably had been, by reason of expense and other burdens involved, either almost a monopoly in such communities in favor of resident contractors or irregularities in the issuance of licenses and in their use when a foreign contractor obtained a job in such a municipality. All of this is fully borne out in the presentations of industry spokesmen at a public hearing held by Governor Meyner when he was considering whether to approve 1960 *Senate Bill No.* 163 which the Legislature had passed. See transcript of the hearing, November 10, 1960. This bill was substantially the same as the present law in its pre-amendment form. *L.* 1962, *c.* 162. The Governor called the hearing to ascertain how the public interest was served by the legislation. The only speakers were industry representatives, some speaking in favor and some, from elements now represented by plaintiffs, against. The principal argument offered in support of the bill was that outlined above, with respect to which it may be observed that, while some stress was laid on the fact that the economic interest of the public in such licensing municipalities might be served by doing away with the local licensing through greater competition and possible lower prices for electrical work therein, there was little talk that the bill would enhance the public safety. Thereafter the Governor pocket vetoed the bill. It may also be noted that this same reason for enactment of the statute before us was indicated by the chairman of the Board in his testimony in the trial court.

---

[1] Most of the municipalities which had such licensing ordinances also required local governmental inspection of electrical work, allowed by a long existing statute applicable only, however, to municipalities classified as cities. *N. J. S. A.* 40:173–1 through 3, originally enacted in 1912. (An additional statute, passed in 1929, authorized counties to require such inspection on a county-wide basis. *N. J. S. A.* 40:23–20 through 25. We do not know whether this authority has been utilized by any county.) The present law expressly saves this permissive municipal power to inspect electrical work and to regulate the standards and manner in which it shall be done. *N. J. S. A.* 45:5A–17.

As has been said, the Board now urges this reason as sufficient in itself to sustain the validity of the statute. Since the point has not been briefed, we will not pass on it. It does seem evident, however, that any strength in the reason would have to be grounded in such ordinances themselves being valid, which in turn raises questions of whether they are within the legislative power delegated to municipalities and, if that be answered in the affirmative, whether the licensing scheme and requirements thereof conform to general police power requisites. In any event, neither the scope of municipal power, whatever that may be, nor the matter of their validity under the police power can be determinative of whether the state law before us meets constitutional requirements.

We thus are brought to a closer consideration of the question in the case which particularly concerns us at the moment, *i. e.,* the police power–due process issue. It may be pertinently phrased as the matter of the reasonable relation of the statutory scheme to the meeting of the public evil of faulty electrical work, or, to put it another way, whether the means and technique of business licensing prescribed are so indirect and remote in relation to meeting the evil as to be arbitrary and an illegal restraint on the right to pursue a lawful occupation. We are fully cognizant of the limited judicial role in reviewing the validity of legislation in this respect, particularly that enacted at the state level. We cannot "sit as a superlegislature or concern ourselves with the wisdom or policy underlying the statute." *Hudson County News Co. v. Sills,* 41 *N. J.* 220, 229 (1963). Granting the general subject matter as clearly within the police power, we must not strike down a legislative effort merely because we personally do not believe the means adopted represent the best or wisest method. By reason of the presumption in favor of constitutional validity, factual support for the legislative judgment is to be assumed and, in the absence of a showing to the contrary, the burden of which falls on the challenger, a court will assume that the measure rested

"upon some rational basis within the knowledge and experience of the Legislature." *Reingold v. Harper, supra* (6 *N. J.* 196). All of this does not mean that a court will not carefully examine the technique and scheme prescribed and determine the matter of their rational relation to the evil and the legislative objective, within the basic principles just expressed. Nor does it mean that a challenger may not meet his burden by reliance on the face of the act or on facts of which judicial notice may be taken, or at least shift to the defender the obligation to come forward with an affirmative factual presentation in support of rationality. *Cf. Moyant v. Borough of Paramus,* 30 *N. J.* 528, 535 (1959).

To be more concrete, what bothers us, as it bothered the trial court, is that, apart from the fact that the statute does not require any proof of competency of those who actually do electrical work, there is no express requirement even that the individual licensee who qualifies a business for the business permit supervise or inspect the work done by employees or be responsible for the competence of that work from the standpoint of public safety. The problem is one of finding sufficient assurance that the statutory scheme is reasonably designed to and will result in an appreciable meeting of the evil of faulty work. Everyone agrees that such a finding is necessary to sustain the statute, and the case has been presented on that thesis. The trial court said that the act would be "meaningless" without this requisite. This is particularly so when the obvious selfish motivations for the legislation earlier pointed out come into the picture for consideration. It may be that there are hard economic realities inherent in the electrical contracting business, overcoming the shortcomings in the statute itself, which would, practically, assure these salutary consequences and dissipate our concern, but the present scanty evidential record does not disclose them to our satisfaction.

We need not repeat our previous analysis of the principal provisions of the statute which clearly demonstrated the absence of any specific requirement of licensee supervision or

responsibility.[2] Other provisions of or omissions from the law do not support any implied requirement of this nature and really seem to lean the other way. For example, in specifying grounds for revocation of a license or business permit, *N. J. S. A.* 45:5A–17 goes no further than to authorize such action where the holder "demonstrated a level of competence manifestly inconsistent with retention" or "committed an act of gross negligence or condoned such an act by an employee of his." The concept of condonation can well be said to evidence a negative intent as to any obligation of affirmative supervision of employees. Moreover, the statute does not even specify any safety standards to which all electrical work done by licensed contractors must conform, except those which may be imposed by the relatively few municipalities having a system of local electrical inspection.

As far as evidence beyond the statute itself is concerned, there is no statement annexed to any bill introduced on the subject except the one previously referred to and we can find no record that any legislative committee hearing was ever held over the years. Governor Hughes, in approving *L.* 1962, *c.* 162, did speak of the relationship of the measure to factors of human safety, without specification. Before signing it, he may have been furnished with supporting proofs of the type we find missing in the present record, but, if so, such have not been called to our attention.[3]

---

[2] 1961 *Senate Bill No.* 194, which passed the Senate and received second reading in the Assembly and was introduced by the same legislators who sponsored the 1960 bill vetoed by Governor Meyner as well as the bill which became the pre-amendment version of the present law (*L.* 1962, *c.* 162), provided in effect that the individual tested and licensed to qualify the business for a permit had to be a master electrician with the obligation of supervision of all work performed by the business. 1964 *Senate Bill No.* 326, which was not acted upon by either house, sought to amend the present law by providing instead for the licensing of all individual electricians who perform electrical work for hire.

[3] In the same statement the Governor said that chapter 162 presented "certain technical problems which should be rectified." This resulted in the amendatory enactment, *chapter* 185. As far as the present purposes are concerned, the principal changes made by the

The only testimony below bearing on the question was that of the chairman of the Board, who was asked its "position" with respect to the statutory phrase requiring the individual licensee to be "actively engaged in the business." His answer was hardly responsive and of little help. He said that such a person

"* * * is part of that business, he supervises the work through his foreman and supervisors and he knows what is going on from A to Z * * * Well, he gives out the information to his supervisors in the field. He goes to the field and sees that these supervisors do what he told them to do, in plain language. He goes to the job. He usually goes to the jobs and sees that it is done according to the plans and specifications as to what he contracted for * * *"

The emphasis could well be understood to indicate a primary interest in seeing that the work accorded with what the business was hired to do rather than it complied with all safety standards.

The trial judge concluded, in sustaining the statute, that a requirement of supervision and inspection by the individual licensee, from the public safety standpoint, would have to be read into it. However, we were told at oral argument that the Board has not so specified in its rules, regulations or forms and has made no enforcement effort to require a licensee to so act. We have the impression that licensees have never even been so instructed by the Board. In fact it was conceded at argument that, in the case of a large business, with many jobs being performed at the same time in scattered locations and having but the single licensee on its staff required by the statute, it would be a physical impossibility for that one person to do what the trial court had in mind as its implied statutory obligation. All of this can lead to the thought that it is at least the Board's view that the Legisla-

latter were the insertion of the business permit requirement, the enlargement of exemptions, and requiring that the individual license holder be "actively engaged in," rather than be merely "a representative of," the business thereby qualified to operate.

ture did not intend to require the individual licensee to supervise and inspect, in the public interest, all work done by the business.

■ We cannot help but conclude from all of this that the Board was obligated to go forward with an affirmative factual presentation in support of a rational relation between the statutory scheme and the evil to be met. However, we hesitate to strike down as unconstitutional a police power enactment of the Legislature where there may be available additional factual proofs strongly bearing on the questions raised without giving the opportunity to present such evidence. Therefore we will remand this case to the trial judge for that purpose. We are especially interested in proofs which will assist us in answering the following inquiries:

What, if any, factual realties of the electrical contracting business are there which will necessarily result, under the present statutory scheme, in sufficient supervision and inspection by the licensed individual, from the public interest standpoint, of all electrical work performed by the business in which the licensee is actively engaged? Why does the licensing of one individual and his mere association with a business suffice, in the public interest, to permit an electrical contractor to engage in the business?

What, if any, business factual realities are there which will reasonably assure the meeting of the public evil of faulty electrical work without requiring the testing and licensing of the individual electricians who do the work, or at least those who supervise it, or without requiring universal governmental inspection of all work, or both? Why does the statute not simply require the testing and licensing of such individuals, as distinct from the scheme it prescribes? Why require the business permit in addition, even under the present scheme, to the licensing of individuals? What rational relation is there between it and the meeting of the evil? What is the rational connection between the "grandfather clause" and the meeting of the evil?

What is the rational basis for the numerous exemptions specified by this statute in the light of the evil?

What is the rational basis for the substantial fees imposed by this statute?

On the remand the Board shall present such additional evidence and argument, with the right in plaintiffs, of course, to introduce proofs and argument in rebuttal. The trial judge will make supplemented or amended findings and conclusions and transmit the same to us. We will retain jurisdiction. The parties should thereafter file supplemental briefs in this court, upon the receipt of which we will determine whether we desire further oral argument.

Remanded.

*For remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN — 7.

*Opposed* — None.