48 N.J. 581 (1967)
227 A.2d 313
NEW JERSEY CHAPTER, AMERICAN INSTITUTE OF PLANNERS, ETC., ET AL., PLAINTIFFS-RESPONDENTS,
v.
NEW JERSEY STATE BOARD OF PROFESSIONAL PLANNERS, DEFENDANT-APPELLANT, AND LEE T. PURCELL AND DONALD R. GOODKIND, DEFENDANTS-INTERVENERS-APPELLANTS.
The Supreme Court of New Jersey.
Argued November 7, 1966.
Decided February 20, 1967.
*586 Mr. Joseph A. Hoffman, Assistant Attorney General, argued the cause for defendant-appellant (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. Theodore W. Geiser argued the cause for defendants-interveners-appellants (Messrs. Pindar, McElroy, Connell & Foley, attorneys; Mr. Adrian M. Foley, Jr., of counsel; Mrs. Sonia Napolitano, on the brief).
Mr. Ronald Berman argued the cause for plaintiffs-respondents (Messrs. Berman & Etz, attorneys).
Mr. Harry A. Walsh, attorney for New Jersey Society of Architects, argued the cause amicus curiae.
Mr. John L. Miller, Jr. argued the cause amicus curiae for New Jersey Society of Professional Engineers (Messrs. Miller, Myers, Matteo & Davis, attorneys; Mr. Theodore H. Davis, on the brief).
The opinion of the court was delivered by FRANCIS, J.
In this declaratory judgment proceeding the Chancery Division of the Superior Court declared unconstitutional a portion of section 11 of the professional planners licensing act, L. 1962, c. 109; N.J.S.A. 45:14A-11. The condemned portion exempted duly licensed professional engineers, licensed land surveyors and registered architects of this State from the requirement, imposed by the statute on all other persons, to take and pass an examination for a planner's license, and it directed the State Board of Professional Planners (which was created by the same statute) to issue such a license on application therefor and payment of fee by any such exempted person. The trial court also held that the invalid portion of section 11 was severable, and not so intimately connected with the statute as to indicate that the Legislature would not have adopted the remainder without it. The Board was restrained from issuing *587 licenses to persons who sought to qualify under the offending exemption. An appeal was taken to the Appellate Division, where the restraint was continued until final judgment. Thereafter, before the matter was reached for argument there, all parties moved for certification pursuant to R.R. 1:10-3, and we granted the motion.
The action was instituted by the New Jersey Chapter, American Institute of Planners, an unincorporated association of the State of New Jersey. The association is a professional society created to study and advance the art and science of city, regional, state and national planning. The complaint fails to allege that the organization consists of seven or more members, which the statute, N.J.S. 2A:64-1, indicates is a prerequisite to suit in the entity name. But no attack on its standing to act as plaintiff is made on that ground. Six individuals joined as plaintiffs describing themselves as engaged in the practice of professional planning, and alleging that they are all qualified by education and training to engage in the practice of planning.
The only defendant named in this complaint was New Jersey State Board of Professional Planners. Thereafter the New Jersey Society of Professional Engineers, the New Jersey Association of Consulting Engineers and the New Jersey Society of Architects were allowed to intervene as defendants in the trial court. Although designated amici curiae, they were given leave to participate in the proceedings as fully as if they were named defendants originally. After entry of judgment in the trial court, Donald R. Goodkind and Lee T. Purcell, licensed professional engineers, were granted leave to intervene as defendants so as to participate in the appeal.
The standing of the Institute to bring the action challenging constitutionality of a part of the statute is contested for the first time on appeal. In doing so, appellants place reliance upon the much criticized case of New Jersey Bankers Ass'n v. Van Riper, 1 N.J. 193 (1948). See, *588 Schnitzer, "Civil Practice & Procedure," 9 Rutgers L. Rev. 307, 317 (1954); Jaffee, "Standing to Secure Judicial Review: Private Actions," 75 Harvard L. Rev. 255, 301 (1961). We need not resolve the issue here, but see New Jersey State Bar Association v. Northern New Jersey Mortgage Associates, 22 N.J. 184, 196 (1956). The individual plaintiffs as practicing planners have sufficient interest in the validity of the statute to prosecute the action. N.J. Home Builders Ass'n v. Div. on Civil Rights, 81 N.J. Super. 243 (Ch. Div. 1963), aff'd sub nom. David v. Vesta Co., 45 N.J. 301, 309 (1965).

I

THE STATUTE
Prior to 1962 unsuccessful attempts were made under the sponsorship of the American Institute of Planners to obtain passage by the Legislature of a so-called professional planners licensing act. The proposal encountered opposition from other established professional groups, principally engineers, land surveyors and architects, who were already subject to separate licensing statutes and who had qualified for licenses by meeting the conditions imposed thereby. Finally in 1962 the act in question, obviously a compromise measure (more of this later) was adopted with the acquiescence of the competing interests, as chapter 109 of the Laws of 1962.
The act provided that after July 10, 1962 no person could practice or offer to practice professional planning in this State unless he were licensed to do so under its provisions. The practice of professional planning is defined in most general terms in section 2 as "the administration, advising, consultation or performance of professional work in the development of master plans in accordance with the provisions of chapters 27 and 55 of Title 40 of the Revised Statutes, as amended and supplemented; and other professional planning services related thereto intended primarily to guide governmental policy for the assurance of the orderly *589 and co-ordinated development of municipal, county, regional, and metropolitan land areas, and the State or portions thereof." N.J.S.A. 45:14A-2.
Chapters 27 and 55 of Title 40 provide for the creation of county, regional and municipal planning boards to make and adopt master plans for the physical development of the political unit involved. For example, a county planning board is directed to make a master plan for the physical development of the county, and such plan with the accompanying maps, plats, charts and descriptive and explanatory matter is required to show the board's recommendations for the development of the territory covered by the plan, and may include "among other things, the general location, character, and extent of streets or roads, viaducts, bridges, waterway and waterfront developments, parkways, playgrounds, forests, reservations, parks, airports, and other public ways, grounds, places and spaces; the general location and extent of forests, agricultural areas, and open-development areas for purposes of conservation, food and water supply, sanitary and drainage facilities, or the protection of urban development, and such other features as may be important to the development of the county." N.J.S.A. 40:27-2. The board is authorized to employ "experts" for the making of the plan. N.J.S.A. 40:27-3.
A regional planning board, if created, is directed also to make a master plan and "such surveys and studies as may be essential thereto," including "all the elements of physical development that may be locally important and desirable." N.J.S.A. 40:27-10.
A municipal planning board is authorized to prepare "a master plan for the physical development of the municipality which generally shall comprise land use, circulation, and a report presenting the objectives, assumptions, standards and principles which are embodied in the various interlocking portions of the master plan." The plan "shall be a composite of the one or more mapped and written proposals recommending the physical development of the municipality *590 * * *." N.J.S.A. 40:55-1.10. "[T]he master plan may cover proposals for:
(a) the use of land and buildings  residential, commercial, industrial, mining, agricultural, park, and other like matters;
(b) services  water supply, utilities, sewerage, and other like matters;
(c) transportation  streets, parking, public transit, freight facilities, airports, and other like matters;
(d) housing  residential standards, slum clearance and redevelopment, and other like matters;
(e) conservation  water, forest, soil, flood control, and other like matters;
(f) public and semi-public facilities  civic center, schools, libraries, parks, playgrounds, fire houses, police structures, hospitals, and other like matters;
(g) the distribution and density of population;
(h) other elements of municipal growth and development." N.J.S.A. 40:55-1.11.
The master plan is required to be made "with the general purpose of guiding and accomplishing a co-ordinated, adjusted and harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, morals, order, convenience, prosperity and general welfare, as well as efficiency and economy in the process of development and the maintenance of property values previously established. To such end, the master plan shall also include adequate provision for traffic and recreation, the promotion of safety from fire and other dangers, adequate provision for light and air, the promotion of good civic design and arrangements, the wise and efficient expenditure of public funds, and adequate provision for public utilities and other public requirements." N.J.S.A. 40:55-1.12.
In order to become licensed as a professional planner, a candidate must file an application under oath showing that he has the minimum educational qualifications. They are:
*591 (a) A graduate degree in professional planning from an accredited college or university in a curriculum in recognized planning subjects as shall be approved by the State Board of Professional Planners, plus a minimum of three years experience in the full-time practice of professional planning; or (b) an undergraduate degree from an accredited college or university in a curriculum offering a major or option comprising a minimum of 21 credit hours in such recognized planning subjects as shall be approved by the board, with a minimum of four years experience in the full-time practice of professional planning; or, (c) graduation from a secondary school and at least 12 years of professional planning experience acceptable to the board; or, (d) for a period of eight years only subsequent to July 1, 1963, a degree in a closely related course of study such as architecture, landscape architecture, engineering, law, sociology, geography, public administration, political science or economics, with a minimum of 18 credit hours in recognized planning subjects included as part of or in addition to such courses of study in an accredited college or university, plus a minimum of five years experience in the full-time practice of professional planning. (Emphasis ours) In addition the applicant must obtain a passing grade as determined by the board upon a qualifying examination to be prepared by the board or by experts chosen by it, and given annually. The examination is to cover such subject matters as (a) history of urban, rural, and regional planning; (b) fundamental theories, research methods and common basic standards in professional planning; (c) administrative and legal problems, instruments and methods; (d) current planning design and techniques; (e) history, principles and requirements of planning and zoning procedures in the State of New Jersey. N.J.S.A. 45:14A-8, 9. A grandfather clause is added by section 19 under which, for a period of one year from July 1, 1963, persons having certain listed qualifications may be granted licenses without examination. N.J.S.A. 45:14A-19. The clause is not involved in these proceedings.
*592 A "State Board of Professional Planners" is established consisting of five members appointed by the Governor, with the advice and consent of the Senate, who shall be professional planners licensed under the act. N.J.S.A. 45:14A-4. For obvious reasons the members of the first Board are not required to be such licensed planners. But they must be members of the recognized organization representing professional planners in the State, as well as United States citizens, residents of New Jersey, with at least five years active experience in professional planning, and of good standing in the profession. N.J.S.A. 45:14A-4, 5, 20. (Note that the reference in section 20 to section 3 of the act probably should be to section 4.) The board is given power to make and enforce rules and regulations necessary to carry out the provisions of the act, and to discipline licensed planners for their violation. N.J.S.A. 45:14A-4, 15.

II

THE SECTION OF THE ACT UNDER ATTACK
When the statute was adopted by the Legislature it contained section 11 consisting of five paragraphs dealing generally with the license-qualifying examinations. The fourth paragraph provides:
"The board upon application therefor and the payment of the application and license fees fixed by this act shall issue a certificate of license as a professional planner to any duly licensed professional engineer, licensed land surveyor or registered architect of New Jersey."
This paragraph was not included in the bill, A 546, as introduced in 1961 under the sponsorship of the New Jersey Chapter of the American Institute of Planners. It was inserted, however, (along with section 3, N.J.S.A. 45:14A-3, and part of section 17, N.J.S.A. 45:14A-17, to be more specifically referred to hereafter in connection with the discussion of severability of section 11), in order to exempt *593 the described engineers, land surveyors and architects from the obligation of satisfying the qualifications required of other aspiring planners and from the burden of taking and passing the licensing examination.
Plaintiffs challenge the validity of the fourth paragraph, saying it denies them equal protection of the law contrary to the guaranties of the Federal Constitution and the New Jersey Constitution. More specifically they say that by requiring all persons except licensed professional engineers, licensed land surveyors and registered architects of this State to possess certain educational qualifications and experience in the field of planning, and to take and pass an examination on subjects related to that field in order to be licensed as a practitioner of planning, the legislation violates the cited constitutional strictures against discrimination.

III

SEVERABILITY
Plaintiffs' treatment of the statute is not limited to the alleged unconstitutionality of the fourth paragraph of section 11. They assert that upon being adjudged invalid the paragraph is severable from the statute and the remainder thereof may stand as a complete and independent legislative enactment regulating the practice of professional planning. In order to set out the primary constitutional issue in the case in bold relief we shall deal first with the problem of severability.
Ordinarily if a part of a statute is adjudged invalid and the remainder can stand independently without conflict with the over-all basic purpose of the Legislature, it will be allowed to do so. N.J.S.A. 1:1-10. But if it appears that the objectionable feature cannot be excised without substantial impairment of or conflict with the over-all legislative purpose, the entire enactment must fall. Ahto v. Weaver, 39 N.J. 418, 427 (1963); Angermeier v. Borough of Sea Girt, 27 N.J. 298, 311 (1958). Whenever the provisions of an act *594 are dependent, conditioned or connected in such fashion as to warrant the belief that the lawmakers intended them to exist as a whole, they must stand or fall together. State, Van Cleef, pros., v. Comm'rs of Sts. and Sewers of City of New Brunswick, 38 N.J.L. 320 (Sup. Ct. 1876). It is not enough in itself that the invalid portion or section of a statute is excisable in fact; additionally, in such case, a clear intention must appear on the part of the Legislature to authorize severability and consequent continued viability of the statute. Sarner v. Union Tp., 55 N.J. Super. 523 (Law Div. 1959). In this connection the judicial branch of the government is conscious that the doctrine of severability must be applied with caution; it must be sensitive to the fact that in enforcing valid elements of a statute which contains invalid elements, there is danger of usurpation of legislative power. Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 556 (1949).
In this instance we are satisfied from the legislative history and from an examination of the statute as a whole that the Legislature would not have adopted it without the exemption provision contained in the fourth paragraph of section 11.
The first proposed planners' licensing act to be presented to our Legislature was introduced in 1958 (A 206) under the sponsorship of the American Institute of Planners. It did not contain an exemption for engineers, land surveyors and architects. There is no doubt it encountered opposition from those groups, particularly from the New Jersey Society of Professional Engineers. It was not adopted. Thereafter futile attempts were made in 1959 and 1960 to procure passage of such legislation. Then in 1961 two bills were introduced, one sponsored by the Society of Professional Engineers (A 483), and the other by the Institute of Planners. (A 546). The bills continued the conflict between the professions. The engineers' bill provided for the registration and licensing of professional planners, and created an administrative and examining board to carry out its provisions. The board was *595 to consist of five engineers, one of whom would also be a licensed land surveyor, and one a licensed professional planner. The planners' bill called for establishment of a separate board of licensed professional planners. The statement originally attached said among other things:
"Planning is a distinct, separate profession, which requires specialized training. It is not a branch of engineering, architecture, or any other profession. Thirty leading colleges and universities award degrees in planning, and more than 400 New Jersey municipalities and 15 counties have planning boards"
As we were advised at oral argument, it became apparent that neither bill could pass to the exclusion of the other. The engineers, land surveyors and architects seemed to feel there was no need at all to regard planning as a distinct profession and to require licenses for planners as such. But if the Legislature disagreed and found justification for such regulation, then they felt that persons in their professions who took and passed the examinations for licenses to practice in their respective fields, as already required by separate statutes, ought to receive automatic licensure under the planners' act. In 1962 an obvious compromise in the form of the present statute was submitted and adopted. It became chapter 109, L. 1962.
The statement apparently as amended by the Senate Committee, and attached to the compromise bill, contained some significant departures from the one on the original planners' bill. The paragraph quoted above was dropped and the following was substituted:
"Planning is a profession, which requires specialized training."
Note that planning is no longer described as a "separate and distinct" profession; further, that the description of planning as not being a "branch of engineering, architecture or any other profession" is excised. Moreover, the statement *596 contains a reference to the fact that special provisions are included for the licensing of persons with degrees "in related fields" and for "all licensed professional engineers, land surveyors and registered architects of the State of New Jersey." And it says that the bill "has been drawn for the primary purpose of protecting the great interests of New Jersey's citizens in competent planning by qualified personnel."
Differences in the act as adopted and the bill, A 546, as submitted by the Institute of Planners are significant on the issue of severability. We have set forth above the very general definition of professional planning in section 2 of the statute as enacted. The term was defined in part in A 546 as:
"The term includes the collection, analysis, evaluation and presentation of facts, trends and proposals, and the development of integrated plans for both future growth and renewal, by means of statistical analysis, reports, graphs, diagrams, maps, charts, and other means of graphical representation; it also includes the consideration of population and income trends, public finance, inter-governmental relationships, existing and future land use patterns and need, public and community facilities, capital improvement programs, circulation and transportation, conservation of resources and open spaces, and such other matters as are relevant to the appropriate development and administration of the aforementioned."
This definition was intended to highlight the claim by the planners that their concern is with the socio-economic as well as physical aspects of development of governmental units, and that other disciplines such as engineering, architecture and land surveying occupy a secondary role, simply supplying some component data for use of the planners in formulating a master plan for the orderly development of the particular community. The Senate Committee dropped the above-quoted portion of the definition of planning from the statute as enacted.
In the statute itself are examples of belief and recognition by the Legislature that engineering, land surveying, architecture and planning are allied disciplines, and that those engineers, surveyors and architects who already have passed or thereafter pass a State-imposed qualifying examination *597 in their professions ought to be regarded as prima facie competent to practice planning, and therefore to be licensed in that field if they desire, without being subject to another examination. Section 2 says in part:
"The work of the professional planner shall not include or supersede any of the duties of an attorney at law, a licensed professional engineer, land surveyor or registered architect of the State of New Jersey." N.J.S.A. 45:14A-2.
Section 3 provides:
"Nothing in this act shall be construed to prohibit any licensed professional engineer, land surveyor or registered architect in the State of New Jersey from engaging in any or all of the functions or performing any or all of the services set forth in this act, provided however that such persons shall not hold themselves out as professional planners or planners." N.J.S.A. 45:14A-3.
Since the Legislature recognizes their competency to practice planning, if such engineers, land surveyors or architects wish to hold themselves out as professional planners, they may obtain the license to do so simply by applying for it and paying the required fee. N.J.S.A. 45:14A-11.
The history of the act and its evolution into the form which made it acceptable legislatively demonstrate plainly that the establishment of prerequisites for licensing planners, and the provisions for exemption therefrom of licensed engineers, land surveyors and registered architects were intended to be interdependent and to exist as a whole or not at all. In addition to the matters noted above, the record shows that at the time of adoption of the statute, in spite of the heavy and growing demand for planners, there were only a few hundred persons engaged in planning in New Jersey, whom the plaintiff Institute of Planners considered qualified to be professional planners as the Institute would have the Legislature define and limit the practice. By making automatic licensure available to over 12,000 New Jersey licensed engineers, land surveyors and registered architects who might *598 wish to enter the field or to continue practicing therein, the lawmakers clearly revealed they were opposed to granting a monopoly to those few who could qualify immediately under the form of statute originally proposed by the Institute. Thus, if the exemption above were to fall the legislative aversion to the few and its preference for the many would be frustrated. In our judgment the conclusion is inescapable that the statute would not have been adopted without the exemption of the fourth paragraph of section 11. Moreover, the record and the oral arguments of the parties reveal that in its ultimate form the act was a compromise. It was accepted as such by the partisans of the planners on the one hand and the engineers, land surveyors and architects on the other, and enacted by the Legislature on that basis. Under the circumstances, even if the exemption provision now challenged by the plaintiffs were unconstitutional, the suggestion of its severability from the remainder of the act scarcely would strike a sympathic chord. We are satisfied that if the exemption provision were invalid, it would be usurpation of the legislative province for a court to allow the remainder of the enactment to stand without it. Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 556 (1949). Therefore whether the entire act here shall stand or fall depends upon our determination of the constitutionality of the fourth paragraph of section 11, to which we now turn.

IV

THE CONSTITUTIONALITY OF THE FOURTH PARAGRAPH OF SECTION 11, CHAPTER 109, L. 1962.
In essence this statute, chapter 109 of the Laws of 1962, is another occupational licensing act. It has been suggested, not without reason, that such enactments have become epidemic in our economic life. As was the case in Independent Electricians & Electrical Contractors' Association et al. v. New Jersey Board of Examiners of Electrical *599 Contractors, 48 N.J. 413 (1967), the legislative history recounted above shows that the agitation for the legislation came, as so frequently happens, from those who describe themselves as professional planners, and not because of any public demand. It seems fair to say also that their principal motivation was self-interest rather than public interest. See, Note, 14 Stan. L. Rev. 533, 535-537 (1962); Silverman, Bennett & Lechliter, "Control by Licensing Over Entry Into the Market," 8 Law and Contemp. Problems 234 (1941); Gellhorn, Individual Freedom and Governmental Restraints 109 (1956). The work of those who style themselves professional planners is pretty much limited to activities in behalf of public entities, or governmental units, such as municipalities, counties and the State. And primarily they concern themselves with the fashioning of plans and master plans for the orderly and coordinated physical development and redevelopment of land areas in such units or in a combination of them.
The argument has been advanced persuasively that there is no public need for the exercise of the regulatory police power in this occupational area. It is said that the governmental units (which are practically the only clients of the planners), unlike the ordinary member of the public, are sufficiently sophisticated to know the individuals and organizations that are competent or experienced in planning and redevelopment. Moreover, defendants point out that selection of planners has been made the subject of executive regulation at various levels of government, state and federal, which makes it extremely unlikely that an unqualified person representing himself as a planner would be employed. But there is no doubt that under its broad police power the State may regulate occupations, professions and businesses in the interest of the public welfare. If pursuit of a particular occupation or the practice of any of the learned or statutory professions can be said to have a connection with or an impact upon the public weal, and there is any reasonable basis for regulation or control thereof to protect or preserve the *600 particular public interest affected, the Legislature may do so constitutionally, so long as the means adopted are not arbitrary and are reasonably related to the felt public need. If the need is not wholly illusory and the regulation imposed is reasonably calculated to satisfy the need, the wisdom or unwisdom of the particular form of regulation cannot be a matter of judicial concern. If the subject is within the police power of the State, even debatable questions as to reasonableness of the means employed are not for the courts but for the Legislature. Sproles v. Binford, 286 U.S. 374, 388-389, 52 S.Ct. 581, 76 L.Ed. 1167, 1178-1179 (1932); Atchison, Topeka & Santa Fe R. Co. v. Matthews, 174 U.S. 96, 103, 19 S.Ct. 609, 43 L.Ed. 909, 912 (1899); Abelson's, Inc. v. N.J. State Board of Optometrists, 5 N.J. 412, 420 (1950); 16 Am. Jur.2d, Constitutional Law, § 323 (1964).
The public interest and welfare are substantially involved in the creation of sound master plans for the orderly development and redevelopment of land areas in municipalities, counties, regions and the State, as well as in the effectuation of such plans in an orderly physical and financially feasible manner. Expenditures of large sums of public money frequently are required over considerable periods of time in pursuing the planned ends, and the welfare, tranquility and ordered living of the citizen are promoted by the achievement of those ends. Plainly it is within the police power of the State to enact reasonable standard regulatory or licensing measures to insure that all persons who offer their services for such planning purposes are prima facie qualified to perform them. Exercise of that power cannot be banned by the judiciary because some governmental units may know certain competent planners, or because some of the units have previously established qualification standards of their own for planners who seek local employment. For these reasons we put aside the suggestion  not too strenuously advanced  of the individual intervener-defendants that the statute in its entirety is an unreasonable exercise of the police power, and therefore unconstitutional.
*601 The more specific issue vigorously argued by plaintiffs is that by exempting licensed professional engineers, land surveyors and registered architects from the educational requirements and examination for a planner's license, while requiring all other persons, particularly those educated for and trained in planning, to satisfy the requirements, the statute transgresses the constitutional mandate for equal protection of the law. They urge that all persons have a common right to aspire to and qualify for the practice of a profession or occupation, and are entitled to be treated equally with respect to State-imposed tests for license to do so. And they contend that creation of the exempt separate class of engineers, land surveyors and architects, and authorizing automatic licensure for such persons violates the basic charter right of all other persons not to be treated in discriminatory fashion.
As we have said, if some reasonable basis exists for the conclusion that regulation of a particular occupation is justifiable in the public interest  as it does here  the courts will accept the decision of the Legislature to do so. Moreover, judicial acceptance of the legislative decision to regulate and to license is not conditioned upon a mechanistic requirement that all persons or classes of persons who engage in the occupation must be made subject to or treated alike in the statutory implementation of the decision. The constitutional mandate for equal protection does not mean that the regulation must reach every class to which it might be applied  that the Legislature must regulate all or none. The Legislature has wide discretion in the creation of or recognition of classes for different treatment. Equal protection does not require that all persons be dealt with identically. If there is some reasonable basis for the recognition of separate classes, and the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to achievement of the State's objective; the separate *602 treatment must admit of but one conclusion beyond a rational doubt, i.e., that the basis therefor is arbitrary and unreasonable, and without relevance to the legislative goal. Sproles v. Binford, supra; Atchison, Topeka & Santa Fe R. Co. v. Matthews, supra; Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199 (1960); N.J. Restaurant Ass'n v. Holderman, 24 N.J. 295 (1957); Washington National Ins. Co. v. Board of Review, 1 N.J. 545 (1949); Robson v. Rodriguez, 26 N.J. 517 (1958).
Equal protection is not denied because a regulatory statute might have gone farther than it did, or might have included some persons or classes of persons who were excluded. Regulatory need in a particular field may appear to the legislative mind in different dimensions and proportions; as more acute in one area than in another. Consequently the reform may proceed one step at a time, addressing itself to the aspect of the problem which seems the most pressing. The Legislature may feel that a sufficiently identifiable group or class of people operating partly or wholly in the field under consideration and already subject to some regulation does not present the same problem as those seeking to practice in the field without having met any publicly imposed standards of competence. In short, equal protection does not demand immediate logical tidiness; nor is it violated because the legislation as enacted does not bring about the full reform or result intended to be produced. In an area of many competing pressures the constitution is satisfied if the Legislature, in responding to what it conceived to be living facts calling for regulation, did not disregard reason in drawing its lines. That those lines might have been drawn more suitably in light of the whole problem is not a matter for judicial re-examination. Classification is a perennial and difficult problem, capable of no doctrinaire solution. Basically the solution resides in the legislative domain and the judiciary will not intrude unless the classes established for separate treatment represent invidious discrimination, that is, treatment which has no rational basis in relation to the *603 specific objective of the regulatory legislation. Joseph E. Seagram & Sons v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336, 347 (1966); Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); Williamson v. Lee Optical of Okl., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563, 573 (1955); Sproles v. Binford, supra; Roschen v. Ward, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722, 729 (1929); Atchison, Topeka & Santa Fe R. Co. v. Matthews, supra, 174 U.S., at p. 104-105, 19 S.Ct., at 612-613, 43 L.Ed., at p. 913; McNaughton v. Johnson, 242 U.S. 344, 37 S.Ct. 178, 61 L.Ed. 352 (1917); Shelton College v. State Bd. of Educ., 48 N.J. 501 (1967); David v. Vesta Co., 45 N.J. 301, 314-316 (1965); Two Guys from Harrison, Inc. v. Furman, supra, 32 N.J., at p. 218. These principles provide the tests for examination of the merit of challenges to the validity of statutory classifications and to the disparate treatment of the classes established.
In the present instance the Legislature, in answer to solicitation over a long period of time, decided that the public interest and welfare would be served in some measure by the imposition of certain academic, experiential and licensure requirements upon persons who wish to engage in professional planning. In the statutory implementation of that decision the lawmakers declined to accept the definition of planning proposed by the American Institute of Planners. The excluded portion of the definition put emphasis on what the Institute calls the socio-economic aspects of planning, knowledge of which it claims invests the occupation with such distinct and individual characteristics as to warrant acceptance, treatment and licensing of planning as a statutory profession, uniquely separate from any other profession. Instead the lawmakers defined the practice in general terms related for the most part to long standing statutes concerning activities involving fashioning of master plans for the orderly physical development of municipal, county and state units. A permissible inference from the record is that the lawmakers were aware that over the years persons who were *604 qualified and licensed by the State in other disciplines, such as engineering, architecture and to a lesser extent land surveying, had been preparing such master plans.
In establishing the class of persons who would be exempt from the requirements laid down for a planner's license, it should be noted that not all engineers, land surveyors and architects were included. The exemption covers only those who meet the qualifications, pass the examination and obtain the license required by the statute regulating admission to practice their particular profession, be it engineering, land surveying or architecture. Each one of these regulatory statutes sets out the general nature of the functions of each profession, the educational requirements, and the requirement for successful completion of a licensing examination. See N.J.S.A. 45:3-1 et seq. for architects; N.J.S.A. 45:8-27 et seq. for engineers and land surveyors. It is obvious from the professional planners act now before us that the Legislature considered engineering, architecture, and land surveying as sciences which are closely related to planning, and that those who become licensed in the former ought to be considered prima facie competent to pursue the latter. To illustrate: section 9, N.J.S.A. 45:14A-9, specifically refers to architecture, landscape architecture and engineering as "closely related course[s] of study"; the act specifies also that such licensed persons may practice planning even though they do not apply for a planner's license, so long as they do not hold themselves out as professional planners, section 3, N.J.S.A. 45:14A-3; and section 17, N.J.S.A. 45:14A-17, ordains that no such licensed person presently holding an appointment by any governmental unit as a planner shall be removed from his position because not licensed as a professional planner.
A few references to the statutes relating to the licensing of engineers, land surveyors and architects furnish probable reasons for the legislative attitude. For example, the function of the licensed professional engineer is defined to be "application of special knowledge of the mathematical, physical and *605 engineering sciences to * * * consultation, investigation, evaluation, planning, design or general supervision of construction or operation * * * in connection with any * * * engineering or industrial project." N.J.S.A. 45:8-28(b). It is worthy of note in this connection that the current curriculum catalogue for the engineering courses at Newark College of Engineering requires a course in "Elements of Industrial Growth"  a study of "social, economic, cultural and political forces," and provides electives in planning subjects. The civil engineering curriculum at Rutgers, The State University, requires a course in "Development of Western Civilization" and at least 12 credit hours in "Humanities and Social Studies."
The statutory license examination for architects is required to encompass, among other subjects, site planning, history and theory of architecture, and professional administration. N.J.S.A. 45:3-5. Here too, it may be noted that the current architecture curriculum of Princeton University includes a course in "City Planning." At Massachusetts Institute of Technology the curriculum in architecture contains courses in "City Planning" and "Urban Social Structure & Process."
The function of the licensed land surveyor is described in the pertinent statute as "[S]urveying of areas for their correct determination and description and for conveyancing, and for the establishment or re-establishment of land boundaries and the plotting of lands and subdivisions thereof, and such topographical survey and land development as is incidental to the land survey." N.J.S.A. 45:8-28(e).
It is relevant to the above observations to point out that the professional planners act suggests that the examining board would look with approval upon a college or university curriculum offering courses in principles of land use, history of city planning, planning project design, and planning law and administration. N.J.S.A. 45:14A-9.
There is no substantial dispute in the testimony of the expert witnesses who appeared on both sides of the case that *606 there is a definite interrelationship among the disciplines of engineering, architecture, landscape architecture, land surveying and planning. A few statements of various witnesses are illustrative: "The practice of architecture and engineering and planning overlap in all cases. And it is very difficult to isolate one from the other concisely and clearly"; one field overlaps the other "all the time"; "* * * one definitely depends on and is interrelated to the other"; "* * * each one of these professionals almost of necessity has to get in the hair of the other to some extent. I would say I dread the day within my own profession if we started to delineate, try to delineate in some fine fashion the area in which each type of engineer could operate. I think this would lead to chaos and jurisdictional battles and problems. It would be most unfortunate. To some extent the same sort of relationship I think exists between the professions [of engineering, architecture and land surveying] you have enumerated, and there are large areas of overlapping"; unquestionably the three professions are "related to the practice of city planning."
Plaintiffs' experts concede that historically city planning had its origin and its early development "with architects, engineers and landscape architects. That is where we got our original planners"; "they were really planners"; they "came out of" architecture, engineering and landscape architecture. One of defendants' witnesses, an eminently qualified engineer, said:
"Actually engineers have been the real planners for centuries in planning of developments and civil engineering was the outgrowth of what used to be military engineering, because all engineering was in one package and it was handled generally by the military for their purposes.

* * * * * * * *
This continues today to be a responsibility in the field of engineering. I think they are responsible for a good bit of the planning that has been done. Some of the boys in the engineering profession were largely responsible in the formation of the American Institute of Planners, and they participate in it rather heavily."
*607 The text writers support the view that city planning had and has its roots in the three professions recognized by our Legislature. For example, McQuillin, in 1 Municipal Corporations 432 (1949) says:
"The first instance of a comprehensive city plan was that of Christopher Wren for London following the destructive fire of 1666, but it was never adopted. In 1682 a plan for Philadelphia was drafted by civil engineers and surveyors appointed by William Penn. The plan adopted for the national capital was prepared by Major Pierre Charles L'Enfant, a French army engineer employed by Washington, who presented a scheme at once comprehensive and attractive, and the observance of which in the main has enabled the national capital to develop as one among the beautiful cities of the world."
Further:
"As knowing how to do a thing before it is attempted is needed, it is plain that satisfactory city planning and zoning must be the result of the united efforts of the applied talents working in harmony of the various professions, arts and sciences, particularly that of the civil engineer, the architect, the landscape architect, or designer, the economist and the lawyer." Id., at pp. 434-435.
See also, James, Land Planning in the United States for the City, State and Nation (1926), where it is pointed out in chapter 3 that the concept of city planning in the modern sense was first introduced at the Chicago World's Fair in 1893, and that the exposition was the joint effort of architects, landscape architects and engineers.
Plaintiffs' witnesses assert that the modern "new breed" planner is one step removed from the engineers, architects and land surveyors. His claimed separate expertise in the preparation of master plans, they say, comes from knowledge of and training in community studies, which include preparation of base maps, land use surveys, housing conditions, review of business uses, environmental studies in neighborhoods, community facilities, population and economic surveys. This expertise is applied to the conditions and circumstances of a particular community, and a master plan for its physical development is evolved. Thus, plaintiffs say, planners operate *608 on the topmost echelon of the process which in the ultimate produces the comprehensive master plan; at that level they apply their understanding of the operation of socio-economic forces to the component data prepared or compiled by the other professional groups such as engineers, architects and land surveyors, as well as lawyers, financial experts, and experienced men of public affairs, in order to fashion what they believe is the appropriate master plan.
There is no doubt that in more recent years community planning has drawn into its creative work social and economic considerations to a greater extent than in its formative period. And it may be that in the course of time the Legislature will conclude that such a high degree of specialized expertise has come into being in planning that the practice ought to be treated as uniquely separate from and independent of all other professional disciplines. In this event, in its wisdom the Legislature may withdraw thereafter the grant of automatic licensure as professional planners from licensed engineers, land surveyors and registered architects. In this connection, however, the evidence is uncontradicted that at present there is a shortage of persons engaging in planning, whatever may be their professional, educational or experiential background. According to the Executive Director of the American Society of Planning Officials, the Society advertised about 1300 professional planning jobs during 1965, and at the end of the year about 400 of them were open and unfilled. That number was higher than at the end of 1964, which in turn was higher than in 1963. It may well be that the Legislature felt the need could be alleviated by admitting to the practice of planning without examination those persons who had already qualified for licenses in the related professional fields of engineering, land surveying and architecture. Under all of the circumstances it cannot be said reasonably that planning did not have its gestative stirrings and its early and continued practice in the three exempted disciplines, particularly in engineering and architecture. Nor can it be said on the record before us that it was wholly arbitrary *609 and without reasonable basis for the Legislature to regard licensed members of the three professions as possessing sufficient minimal qualifications for planning to warrant treatment as a distinct class and to grant them exemption from the licensing requirements of the professional planners act, if they wish to practice in that field. Cf. Watson v. State of Maryland, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987 (1910); Williamson v. Lee Optical of Okl., supra; McNaughton v. Johnson, supra; Sproles v. Binford, supra; Peet Stock Remedy Co. v. McMullen, 33 F.2d 669 (8 Cir. 1929).
It is not for a court to resolve the factual controversy projected by the testimony here. The judicial function ends when evidence appears from which the Legislature could have concluded reasonably in 1962 that exemption of licensed professional engineers, land surveyors and registered architects from licensure requirement for planners was rationally related to the basic objective of the planning act. The wisdom or unwisdom of that decision is not for us. We do not sit as a superlegislature to decide whether the classification is "unwise, improvident, or out of harmony with a particular school of thought." Ferguson v. Skrupa, 372 U.S. 726, 731-732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93, 98, 95 A.L.R.2d 1347 (1963). The burden of establishing that it contravenes the equal protection clause rests upon the plaintiffs and it is a heavy one.
The statute comes into court with a strong presumption of constitutionality. In addition, where the challenge is based upon an alleged denial of equal protection, it must contend with the undoubted wide discretion of the Legislature to classify for regulatory purposes, limited only by the injunction not to act without a reasonable basis in establishing the classifications. Moreover, the Legislature conscious of the desirability of regulation in a particular occupation or profession may sense an urgency in one area, while in another it may reasonably have a feeling of absence of immediacy and that existing regulatory measures are adequate in view of the state of the art. It is a commonplace of *610 regulation of business and professional practices that the Legislature "may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies * * * or because of `some substantial consideration of public policy or convenience or the service of the general welfare.'" N.J. Restaurant Ass'n v. Holderman, 24 N.J. 295, 300 (1957); David v. Vesta Co., supra.
The notion that the lawmakers felt the desirability of some control of the developing practice of community planning must be accepted. It is reasonable also to conclude from the record that an awareness existed of the present shortage of persons engaged in the practice. Further, the evidence submitted warrants the inference that the legislators were aware of the historical part played by the engineers, land surveyors and architects in the development of community planning, and the continuing practice of such planning as an incident of their professional work. All of these circumstances suggest the view that the Legislature felt the current need in the field of community planning was for regulation of those persons who wished to engage in the practice but who had not demonstrated to any public agency that they had sufficient qualifications to do so. The circumstances suggest also satisfaction on the part of the lawmakers that achievement of licensure in one of the three named professions demonstrates possession of sufficient minimal competence to engage in planning to warrant treating such license holders as a separate class and exempting them from the requirements imposed upon those who have no license of any kind to practice planning. Under the principles of law laid down for the control of judicial review, we cannot say that the exempt class created by the fourth paragraph of section 11 is purely arbitrary and without any rational relation to the statutory objective of regulation of the planning profession.
Accordingly the challenged portions of the professional planners act cannot be declared violative of the constitutional mandate for equal protection of the laws. The judgment of the trial court is reversed, and the restraint imposed upon *611 the New Jersey State Board of Professional Planners respecting the issuance of planners' licenses to those licensed in the exempt professions is vacated.
HALL, J. (dissenting in part and concurring in part).
I agree with the trial court's determination, that the portion of N.J.S.A. 45:14A-11 in question is unconstitutional as violative of equal protection and therefore dissent from the majority's contrary conclusion. I concur, however, with the holding of the majority that this portion is not severable. My view consequently is that L. 1962, c. 109, N.J.S.A. 45:14A-1 et seq., must fall in its entirety and I would modify the trial court's declaratory judgment accordingly.
For reversal  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN  6.
For modification  Justice HALL  1.