106 N.J. Super. 458 (1969)
256 A.2d 92
AFFILIATED DISTILLERS BRANDS CORP., A CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF,
v.
ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND JOSEPH P. LORDI, DIRECTOR OF THE DIVISION OF ALCOHOLIC BEVERAGE CONTROL OF THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 1, 1969.
*459 Messrs. Riker, Danzig, Scherer & Brown, attorneys for plaintiff (Mr. Charles Danzig appearing; Mr. Peter L. Berkeley on the brief).
Mr. Arthur J. Sills, Attorney General of New Jersey, attorney for defendants (Mr. Elias Abelson, appearing).
Messrs. Shanley & Fisher, amicus curiae (by Mr. Harold H. Fisher).
HERBERT, J.S.C.
Plaintiff is a wholly-owned subsidiary of Schenley Industries, Inc., a Delaware corporation which, *460 through other wholly-owned subsidiaries, has been engaged for a good many years in the business of distilling, blending, bottling, importing and marketing distilled spirits and wines. Schenley products have been distributed and sold in New Jersey under various brand names, with plaintiff serving as the agency for distribution. It holds a plenary wholesale license issued to it by the Director of the Division of Alcoholic Beverage Control under the authority granted by N.J.S.A. 33:1-11, subsection 1. At all times pertinent to this case plaintiff has held such a New Jersey license.
The complaint is in two counts. The first of these seeks a judgment declaring chapters 58 and 59 of the Laws of 1966 void on various grounds. N.J.S.A. 33:1-43; N.J.S.A. 33:1-93.6 through 93.11. The second count is an alternative to the first: if chapter 58 of the Laws of 1966 is held to be valid, then the plaintiff seeks a declaratory judgment that chapter 58 does not apply to it or that it comes within the exception provided by the statute. Plaintiff's attacks upon the validity of chapters 58 and 59 are for the most part based upon specific provisions of the United States and New Jersey Constitutions. Insofar as necessary, plaintiff's grounds of attack will be mentioned in the discussion which follows.
Plaintiff's activities are not limited to New Jersey. It is the marketing unit of Schenley Industries and sells Schenley products throughout the United States. In 1964 plaintiff's management became particularly concerned with what appeared to be a deteriorating position in the New Jersey market. From a starting point in 1946, when Schenley sales represented about 22% of the total in this State, the Schenley position had changed to approximately 6% of the New Jersey market. Except for sales of products known by private brands, it had been plaintiff's practice to sell only to jobbers in New Jersey who in turn would sell Schenley products to retailers. The jobbers with whom plaintiff dealt were carrying, for sale to retailers, brands of other producers as well as those of Schenley. After a survey plaintiff's management *461 concluded that a concentration of sales effort on retailers, for the benefit of Schenley brands, was needed if Schenley was to get a larger share of the available business, and that the way to get this concentration was for plaintiff to begin to sell directly to retailers. The decision was reached early in the year 1966. Mr. Feldman, who was executive vice-president and then president of plaintiff during this period, testified that the plan to have plaintiff sell to retailers included continuation of the practice of selling Schenley brands to jobbers and did not include any thought of cutting prices.
To carry out its plan plaintiff rented a warehouse containing approximately 60,000 square feet of space; it also employed a sales manager and interviewed various applicants for office positions. It entered into a trucking contract to provide for the delivery of products from the warehouse to retailers. Plaintiff required no supplementary license, because its then existing plenary wholesale license authorized sales directly to retailers. However, plaintiff did, on April 1, 1966, file with the Division of Alcoholic Beverage Control a list of prices at which products would be offered for sale to retailers. The New Jersey Wine and Spirit Wholesalers Association, which by this time had learned of plaintiff's plans, promptly objected to plaintiff's filing on the ground that the regular filing date for the second quarter of the year had passed and that plaintiff's list did not qualify for interim filing under a regulation permitting such procedure for brands "not previously available." The Director upheld the objections of the Association and so informed plaintiff by letter dated May 5, 1966. Plaintiff now points out that the Director had shortly before accepted interim price lists from three holders of new plenary wholesale licenses, thus authorizing them to begin selling wholesaler-to-retailer during the course of a calendar quarter. These instances involved Fine Wines Unlimited of Union, New Jersey, May 15, 1964; Cathay Corporation of Jersey City, August 25, 1965, and Banner Liquor Co. of Perth Amboy, January 17, 1966. However, *462 this action is not an appeal from the Director's ruling of May 5, 1966 against interim filing by plaintiff as a preliminary to the start of the wholesaler-retailer business which it had otherwise made ready for, and I see no particular legal significance in the apparent discrimination except that if the success of the Association in objecting to plaintiff's interim filing be added to what the Association was accomplishing elsewhere, the rulings for Fine Wines, Cathay and Banner may be something more than a suggestion of the Association's power.
The Director's decision to reject plaintiff's wholesaler-to-retailer price lists for the second quarter of 1966 was only a temporary victory for the Association. The Director went on to point out in his letter of May 5 that the last day for filing prices for the third quarter would be May 20 and if proper schedules were received from the plaintiff by that date, sales to retailers might be made during the third quarter. Facing the prospect of competition from plaintiff to start at an early date, the Association took prompt and vigorous action to block plaintiff from using the wholesale-retail authorization contained in its plenary wholesale license. Mr. Cooper, executive director of the Association and a member of the bar, drafted two statutes, apparently with some assistance from other attorneys; and one of these was designed to block plaintiff from selling directly to retailers. Drafts were read to representatives of the Association members at a meeting on March 30, 1966. The minutes show that after the reading the executive director "was instructed to immediately take whatever steps are necessary to have the bills introduced with the fullest possible support by the Administration and Legislature."
Then, on April 7, 1966, there was another meeting of the Association and expenditures were authorized, the minutes reading as follows:
"The Executive Director reported that Schenley Industries through its subsidiary Affiliated Brands was going into the wholesale business in New Jersey in competition with its existing distributors *463 and that the A.B.C. Director informed Schenley he would give permission to file prices as of May 15, 1966. After a full and lengthy discussion, the following motion was duly made, seconded and unanimously carried; that the Executive Director of this Association has full authority to take whatever steps are necessary to protect the interests of members of this Association against Affiliated Brands' activities and do whatever is necessary to prevent, if possible, Affiliated Brands from becoming a wholesaler selling Schenley products directly to retailers and to spend whatever sums are necessary to accomplish this purpose including legal fees for Counsel who may be retained by the Executive Director to represent the Association; further, the Executive Director is authorized to pay to Herman Kluxen whatever travel expenses may be incurred by him in his capacity as Public Relations representative of the Association."
By April 13, 1966 the Association's plans for legislation had become very specific. This is shown by comparing a resolution adopted by the Association on that date with the text of the bills which became Chapters 58 and 59 of the Laws of 1966. The resolution reads:
"Upon motion duly made, seconded and unanimously carried the Executive Director was voted a committee of one to act with full and complete authority in any proper and legal manner whatsoever on behalf of the Association or its individual members and to expend whatever monies might be necessary for the purpose of protecting the interests of the Association or its individual members by reason of a distiller operating its own wholesale house in New Jersey in competition with members of this Association by seeking legislation which would not permit a distiller, rectifier, blender, winery or importer from [sic] having any interest whatsoever in a wholesale house in New Jersey unless on July 1, 1965 and thereafter such wholesaler filed and published in the official and complete wholesale price list brands of alcoholic beverages pursuant to Rules 2 and 3 of Regulations 34; and also, an amendment to R.S. 33:1-43 which would not require the distiller, rectifier, blender, winery or importer to sell to any wholesaler and at the same time protect those wholesalers on a line or lines from being arbitrarily removed."
On April 18, 1966 Senate Bills 356 and 357 were introduced jointly by the minority leader and majority leader of the Senate. Neither bill had a preamble, "a time-honored legislative prefatory device explanatory of the reasons for the *464 law and the objects in view." Jamouneau v. Harner, 16 N.J. 500, 516 (1954). They both passed in the Senate on May 2, 1966, were passed by the Assembly on May 23, 1966 and signed by the Governor on June 2. No public hearings were held by either house. These bills became respectively chapters 58 and 59 of the Laws of 1966. After chapter 58 became law on June 2 the Director of the Division of Alcoholic Beverage Control notified plaintiff:
"As a result of the enactment of Chapter 58 of the Laws of 1966, you may not sell to retailers alcoholic beverages, other than malt alcoholic beverage, and accordingly, your listings will not be included in the Wholesale Price List effective July 1, 1966."
In form chapter 58 of the Laws of 1966 inserted two new paragraphs into Title 33, chapter 1, section 43 of the Revised Statutes. Before the passage of chapter 58, section 43 generally speaking, prohibited any manufacturer or wholesaler of alcoholic beverages from participating directly or indirectly in the retailing of alcoholic beverages and also prohibited a retailer from being, either directly or indirectly, a manufacturer or wholesaler. One of the new paragraphs added by chapter 58 of the Laws of 1966 (and the one drafted to keep plaintiff from using its license for the purpose of selling at wholesale to retailers) reads as follows:
"It shall be unlawful for any owner, part owner, stockholder or officer or director of any corporation, or any other person or corporation whatsoever interested in any way whatsoever in any winery, distillery, or rectifying and blending plant, to conduct, own either whole or in part, or be directly or indirectly interested in the business of any licensee for the sale at wholesale to licensed retailers in New Jersey of any alcoholic beverages, other than malt alcoholic beverages, and such interest shall include any payments or delivery of money or property by way of loan or otherwise accompanied by an agreement to sell the product of said winery, distillery or rectifying and blending plant; except that the foregoing shall not apply in the case of a licensee for the sale at wholesale who on July 1, 1965, and thereafter until the effective date of this act, shall have filed for publication by the Division of Alcoholic Beverage Control price listings for brands of alcoholic beverages pursuant to the rules and regulations of the Division of Alcoholic Beverage Control." *465 This is a penal statute. Unless it is invalid, as plaintiff argues, the unlawfulness which it defines would be subject to the punishment provided by R.S. 33:1-51, that is to say, a fine of $50 to $250 or imprisonment for 10 to 90 days, or both. The penal nature of the act is mentioned here because it may bring into play principles of strict construction for which our courts have expressed approval in a large number of cases. 25 New Jersey Digest, Statutes, p. 236 et seq.
Plaintiff argues that the legislation under attack was clearly and exclusively designed and promoted for the benefit of the members of New Jersey Wine and Spirit Wholesalers Association, and invalid for lack of a sufficient public purpose or as private legislation. In weighing the contentions made along this line, some findings about the Association and its activities in support of the bill are called for.
During 1966 the Association had the names of 26 companies on its membership list. The membership was drawn from "independent" wholesalers licensed by the State of New Jersey, the word "independent," according to Cooper's testimony, indicating a licensee with no tie by way of a proprietary interest with a source of supply to wholesalers. The members pay substantial dues, the total in 1966 being $114,882.22. That total was based upon a rate equal to 1/2 of 1% of the total of gallonage tax (N.J.S.A. 54:43-1) paid to New Jersey on distilled spirits by the particular member. The Association maintains a permanent office. Cooper is president, treasurer and executive director at a salary of $25,000. He and two women, who do secretarial work, are the regular staff of the office. For some years, including 1966, the Association has employed William G. Hetherington & Company, specialists in public relations. For this service an annual retainer of $7,500 was paid. Kluxen, whose name has already been mentioned, was the legislative consultant, or lobbyist, for the Association. He was being compensated by the Association at the rate of $16,000 in 1966 and more recently his pay has been raised to $20,000.
*466 Though the Association listed 26 members in 1966, that number is misleading. Various licensees who are members are tied in common ownerships with other members and in some cases with holders of plenary wholesale licenses who are not members. There are the following combinations within the Association:
(1) Galsworthy  Fleming & Mc Caig  Crest
(2) Reinfeld  Majestic
(3) F & A Distributing Co.  Merchants  Gillhaus
(4) J & J Distributing Co.  Dorchester
(5) Federal (Jersey City)  Federal (Pleasantville)  Gateway
(6) Garden State  Crown
(7) Jersey National (Paterson)  Jersey National (Camden)  Phillipsburg Beverage Co.
In addition, in a number of cases the owner of one of the named groups also owns one or more nonmember holders of a plenary wholesale license. For example, Flaggstaff, a member, owns Banner, which is not a member.
If each of the combinations named above were treated as a single member, the Association would have a total of only 15. Nevertheless, the members of the Association in 1966 had approximately 83% of the wholesaler-retailer market in New Jersey for alcoholic beverages other than beer. The grand total of gallonage tax paid to the state was $27,549,552 and the members of the Association paid of this total $22,996,101 while the nonmember wholesale licensees were paying only $4,553,451. And an even more striking economic concentration exists; the seven groups of tied-together wholesale licensees listed above paid a little more than 66% of the grand total of all taxes paid by all licensees on alcoholic beverages other than beer. The figures of the Beverage Tax Bureau show that in 1966 14,671, 889 gallons of liquor were sold to retailers in New Jersey. Also, that 8,310,192 gallons of wine, 741,034 gallons of vermouth and 491,928 gallons of sparkling wine were sold. The total of gallons for the year, excluding beer, was 24,218,043. Although taxes paid are not a precise indicator *467 of the number of gallons sold, since the tax rate on vermouth and wines is lower than on liquors, still the statistical data in evidence is adequate to show that the members of the Association marketed about 83% of this total, or approximately 19,300,000 gallons in 1966.
The official New Jersey book of listed wholesale prices, effective as of January 1, 1969, contains the price quotation of 60 licensed wholesalers of alcoholic beverages (other than beer) who are offering products to retailers. Included are 25 licensees which were members of the Association in 1966. Of the remaining 35, a total of 15 have only wines and vermouth listed for sale, and a number of others have very short lists of distillery products. Both in number of licenses held and volume of business done the members of the New Jersey Wine and Spirit Wholesalers Association dominate the New Jersey market for distilled liquors at the wholesaler-retailer level.
Returning to the legislation, an active publicity compaign was carried on during the short time between introduction and final passage. Newspaper acticles placed in evidence show that the measures were very specifically described as containing a bar to Schenley's going into the business of selling directly to retailers. A memorandum from Cooper to Hetherington & Company, the firm in charge of public relations for the Association, shows how directly aimed at Schenley was the effort to promote support for the Association's point of view. It reads in part as follows:

"Senate Bill No. 356
"This bill would prevent any distiller, rectifier, blender or winery from having any interest whatsoever in any manner in a wholesale business selling alcoholic beverages which they make to retailers. (You will note that brewers are not affected.) This bill is designed to prevent the current attempt of Schenley Industries to go into the wholesale business through its wholly owned subsidiary, Affiliated Brands, which has held a wholesale license for years but has never sold directly to retailers. There are currently, and have been for many years, at least 11 New Jersey independently owned wholesale houses employing thousands of people with tremendous investments *468 who would be forced out of business in the event Schenley, as a manufacturer, were permitted through its subsidiary to compete in this same market with its authorized distributors.
Actually, this legislation is an extension of existing legislation which prevents a distiller or a wholesaler from having a retail license  `tied-house.' For the first time since Repeal that tied-house situation now looms as a distinct possibility if Schenley is permitted to operate direct or through its wholly owned subsidiary, Affiliated Brands.
While Affiliated Brands has had a wholesale license in New Jersey, it has never sold to retailers and obtained the license solely because the alcoholic beverage law requires that in order to allow missionary men or state managers to represent a distiller, that distiller must first obtain a wholesale license. The fear expressed herein is not idle. There is ample evidence to support the fact that Schenley's ultimate aim is to put out of business those wholesalers now distributing its products with the ultimate result of abrigating [sic] all economic control on the sale and distribution of alcoholic beverages. This, of course, would result in the situation diametrically opposite to the policy and purpose of the Alcoholic Beverage Control Act and the pronouncements of every Alcoholic Beverage Control commissioner, from Burnett up to the present director Lordi, emphasizing that the state of New Jersey is primarily interested in temperance and control, so far as the sale and distribution of alcoholic beverages is concerned. At all times the position of the State at all levels has been to enforce the specific language in the Alcoholic Beverage Control Act which authorizes the director of that division to prohibit anything which is `unduly designed to increase consumption.' Of course, price basically controls consumption."
This was material intended for propaganda uses, which may in some degree explain its lack of truthfulness. The "ample evidence" that Schenley's aim was to put out of business the wholesalers who had been distributing its products was not "ample" and, in fact, did not exist at all; and Schenley, if allowed to sell to retailers, would not have been in an economic or legal position to bring about the dire results forecast by Cooper. However, the interest of the memorandum for present purposes is the direct thrust at Schenley in contrast to the mere mention of the "tied-house" philosophy.
There is no record of any debate in the Senate before the two bills passed there, but a record of Assembly discussion on May 23, 1966 was taken. The measures were moved for *469 passage by Assemblyman Farrington. Among the questions addressed to him before the voting was this:
"* * * isn't it a fact, Mr. Farrington, that the only distiller that would be affected by this is the one that we are all aware of, isn't it true that there are no other distillers that could sell directly to retailers?"
The answer given was:
"* * * with the exception of those that are presently selling direct, that is my understanding of the facts."
Thus, although the name "Schenley" was not used and the accuracy of the answer may be questioned, the Assembly was plainly told that it was considering proposed legislation aimed at a single distiller; and to raise any possibility that Schenley was not recognized by all members present as the distiller referred to in the question and answer, it would be necessary to assume assemblymen do not read the newspapers.
There was also a specific reference during debate to the special-interest nature of the proposed legislation. One member said:
"This bill was introduced in the Assembly [Senate] on April 18th, it was reported out the following week, the week thereafter it was passed in the Senate and received here in the Assembly, and last week, less than a month after this bill was introduced in the first house of origin, it was released out of committee and is now before us for a vote. This bill obviously involves special interest. Bills involving taxes, the labor bills we have seen here today, have never been treated with the speed and courtesy that this bill has received, and yet it is a special interest bill."
Other speakers, who urged passage of the legislation, argued for an extension of the bar against "tied houses," for protection of wholesalers against a distiller's competition, and for protection of the jobs of employees of wholesalers. There was also an argument for keeping prices up, the sponsor of the legislation saying that a distiller selling to retailers
*470 "* * * will hopefully save money, have his products sold for less money, and the cases in the State of New Jersey have held that cheap liquor is not necessarily in the best interest of the people. * * *"
At the close of debate the Assembly voted down, 36 to 15, a motion to lay the subject over for a public hearing. Immediately thereafter Senate Bill 356 (L. 1966, c. 58) was passed by a vote of 46 to 3. Then Senate Bill 357 (L. 1966, c. 59) was passed virtually without discussion and without a dissenting vote.
The legislation  at least in the Assembly, where there is a record  was the product of the strong self-interest of the Association combined with its great political power. Those factors, however, do not make a statute invalid if there is also public need coupled with a reasonable attempt to satisfy it. Independent Electricians, etc., Assn. v. N.J. Board of Examiners, of Electrical Contractors, 48 N.J. 413, 420 and 421 (1967). There Justice Hall, speaking for a unanimous court, cited Reingold v. Harper, 6 N.J. 182, 192 (1951), a case upholding legislation against self-service gasoline stations, but containing a strongly worded condemnation of the perversion of the police power which will result "if the dominant purpose be the advancement of private interests under the guise of general welfare * * *." I doubt that this language is fully supported by the results of other cases involving self-interest legislation, or even by the result in Reingold; but going back to Independent Electricians it may be noted that Justice Hall made a sensible observation (48 N.J., at p. 421) which is very pertinent to the case before me:
"Private interest aspects as strong as they seem to be here will be an important consideration in the total evaluation."
It does seem to be a matter of common sense to weigh more critically a legislative result produced by a small, selfish and powerful group than a statute resulting from a broad public demand.
*471 Grand Union Co. v Sills, 43 N.J. 390 (1964), is relied upon heavily by the Attorney General, and understandably so. That case involved self-interest legislation designed to block the further growth of chain operations in the sale of alcoholic beverages at retail by forbidding anyone to acquire, after the effective date of the act, a total of more than two retail licenses. The constitutional arguments made against the statute by the Grand Union Company and other plaintiffs were much the same as those advanced by plaintiff here. The law was upheld, and the general tone of the opinion which Justice Jacobs wrote for a unanimous court indicates that there was never any doubt about the result. It contains comments suggesting that legislation restricting the privileges of holders of liquor licenses may be entirely outside the scope of constitutional restrictions. Justice Jacobs said:
"Nor do we find any infringement of the constitutional guarantees of due process and equal protection. The appellants hold renewable annual license privileges which are not being taken away from them. Though they will have no right to acquire additional license privileges contrary to the policy embodied in Chapter 152, there is nothing in the constitutional clauses which guarantees any such right. The Legislature may, without at all infringing upon the due process clause, either terminate or severely regulate all liquor sales within the State." (at p. 404).
And at page 399 there was an approving reference to Franklin Stores Co. v. Burnett, 120 N.J.L. 596, 598 (Sup. Ct. 1938), where the State's power to regulate the liquor industry was described as "practically limitless." These comments, when considered with an almost uniform line of New Jersey decisions upholding regulations, leave me with some question as to whether a licensee in the alcoholic beverage industry, who certainly cannot challenge the basic requirement that he be licensed, really has any constitutional rights for our courts to consider.
Counsel for plaintiff has shown an awareness of this question by arguing as the first point of his main brief that the guarantees of the Fourteenth Amendment apply to *472 legislative regulation of alcoholic beverages. Among the cases cited for this are: Hornsby v. Allen, 330 F.2d 55 (5 Cir. 1964); City of Miami v. Kayfetz, 92 So.2d 798 (Fla. Sup. Ct. 1957); George Benz Sons v. Ericson, 227 Minn. 1, 34 N.W.2d 725 (Sup. Ct. 1948); Dade County v. Keyes, 141 So.2d 819 (Fla. D. Ct. App. 1962).
In Hornsby v. Allen, supra, the action had been brought by an unsuccessful applicant for a retail liquor store license. The U.S. District Court dismissed her case, but on appeal judgment was reversed. 326 F.2d 605. In denying an application for rehearing the Court of Appeals said:
"Furthermore, we cannot agree with appellees' contention that a liquor applicant is like a candidate for a state governmental office who has no rights secured by the United States Constitution. The liquor business is like any other business in that the state is limited in its regulation of it by due process and equal protection requirements, although the peculiar nature of the business warrants the imposition of severe limitations on liquor traffic and tight restrictions on those persons engaged in it." (330 F.2d, at p. 56)
In George Benz Sons, supra, a group of licensees challenged legislation designed to prevent manufacturers and wholesalers of "intoxicating liquors" from manufacturing or selling "wines" and to prevent producers and wholesalers of "wines" from manufacturing or selling "intoxicating liquors." The case is interesting because the questions raised bear a degree of resemblance to those of the present case; also because the court emphatically recognized the breadth of legislative power and the limited scope for court review, but nevertheless did review and did hold the statute unconstitutional.
The court said:
"Conceding, then, that the legislature possesses all legislative powers not withheld or forbidden by the state or federal constitutions; that no one has the absolute right to engage in the business of selling intoxicating liquors; that it is a privilege subject to the police power of the state; that no one, once licensed, can acquire a vested right to continue in the business; that it is subject to *473 legislative control and regulation under the police power; that the legislature has the power to make classifications which are reasonable and not arbitrary; that in considering a classification courts are obliged to give the law the benefit of the doubt; that the burden of proving the unreasonable and arbitrary character of the law is upon him who asserts it; and that the classification by the legislature is presumed to be fair until the contrary is established, we come to the question whether the act here under consideration is so unreasonable and arbitrary as to offend the provisions of both the state and the federal constitutions." (34 N.W.2d, at p. 731)
By way of supplement to the authorities cited immediately above, it may be noted that the court in Grand Union considered the constitutional arguments addressed to it and did not dismiss them as inapplicable to a liquor licensing problem. Since Grand Union was decided our Supreme Court has ruled in a group of disciplinary cases that the Division of Alcoholic Beverage Control is not justified in suspending or revoking licenses of bars because apparent homosexuals congregate at those bars. One Eleven Wines & Liquors, Inc. v. Division of Alcoholic Beverage Control, 50 N.J. 329 (1967). Instead of disposing of the particular cases by ruling that they had not been proved in such a way as to fall within the Division's regulation adopted under the power delegated by the Legislature, the court went on to consider the broader problem and held that a charge of mere congregation of apparent homosexuals is unreasonable and legally unsupportable, and suggested a revised regulation which would permit the congregation but forbid overtly indecent conduct in licensed premises. The case is some authority for the proposition that our courts have power to declare unreasonable and therefore invalid conditions imposed upon the holders of liquor licenses by the exercise of legislative power, although it must be conceded that the court expressly recognized the presence and importance of the individual rights of the alleged homosexuals. Without those in the case one may doubt that any property rights of a licensee to conduct his place of business without unreasonable interference would have been enough to reverse the penalties which had been imposed. *474 For the moment, however, the point is that a ruling deemed to be regulatory of the liquor business was reviewed and reversed on the broad grounds indicated in the opinion.
I conclude that it is proper to review the legislation before me from the standpoint of due process and equal protection, using the approaches which have become conventional for those purposes. Starting with all of the concessions made by the Minnesota court in George Benz Sons, as quoted above, the basic question is whether this legislation imposes restrictions related reasonably to the promotion of temperance, or restrictions having such a slight relationship to temperance as to be no justification for legislative interference with freedom of trade even in the alcoholic beverage industry. As a corollary, it may be asked whether there are factors in this record to overcome the presumption of validity?
I see no significant rein upon price cutting in this legislation. Plaintiff has filed regularly with the Alcoholic Beverage Control Division price lists for Schenley products both at the wholesaler-wholesaler level and at the retailer-consumer level. Plaintiff and its parent have depended upon jobbers to buy its products in New Jersey at wholesale and then distribute them to retailers. The scheme of fixed prices has been rounded out by wholesaler-to-retailer prices for Schenley products filed with the Division by individual jobbers as part of the full price list of all producer's products handled by such individual jobbers. In the past and at the present time some leeway has and does exist for price changes. Selling below cost is prohibited, but by reducing its costs at any stage of the producing and distributing process under its control the Schenley organization (or any other distiller similarly situated) could create a situation suitable for price reductions both in its wholesaler-to-wholesaler list and for corresponding reductions in the consumer prices filed. It is so obvious as to scarcely call for comment that any price filed for any product at the wholesaler-to-wholesaler level must be sufficiently lower than the consumer's price filed for that product to allow a margin for both independent jobber *475 and retailer to cover costs and earn a profit. This margin is an economic necessity; without it jobbers and retailers would not handle the distiller's beverages because they could not afford to do so.
In the past and at the present time Schenley has had control over many price-influencing factors. Cost reduction measures, advertising and other promotions, larger or smaller profit margins, have been its to take or decide upon, right up to the point in the process of production and distribution where the independent jobber buys and pays for his Schenley purchases. Add one more step to the many which the distiller has regularly been taking in his business, namely, a wholesaler-to-retailer sales and distribution department in New Jersey, and the potential of price decreases (or increases) will be enlarged somewhat but not in any significant or material degree.
In the publicity campaign which was waged by the Association while the 1966 legislation was pending, it was argued that Schenley, if not blocked by law, would cause plaintiff to cut prices of Schenley products to retailers, would thereby ruin or damage independent wholesalers who had previously dealt in Schenley products, would encourage more drinking of cheaper whiskey and generally threaten or disrupt marketing conditions in New Jersey. The same argument is made here in support of the proposition that chapter 58 represents an appropriate exercise of the police power. I think the argument is economic nonsense. Factually, one of the salient features of it is answered by testimony in the record. A witness declared that Schenley's plan to sell directly to retailers did not involve any thought of cutting prices. I believe that and so find. There was, however, no guarantee given against price reductions in the future. As to the possibility of such reductions in the future, there are obvious economic limitations and some which are legal.
Broadly speaking, any business man, unless he operates at a price-fixed level as does the New Jersey retailer of alcoholic beverages, can reduce his prices. In an ordinary business he *476 may even sell below cost, but the need to make a profit, accountability to stockholders, and the like, dictate a pricing policy adequate to earn a profitable return upon the aggregate of the activities which the business man must carry on to get his products into the hands of his buyer and get paid for them. Add additional costs for distribution and the capital, labor and overhead comprising those added costs will as a matter of economics have to be earned as part of the price charged and something for profit on the new distribution activity will have to be included.
I would suspect that the members of the New Jersey Wine and Spirit Wholesalers Association have been making handsome profits. Their strong reaction to the proposed entry by a major distiller into what they had probably come to regard as their territory so indicates; and there are other indications. Their organization is rather expensive. The Director of Alcoholic Beverage Control has noted in an opinion that the Association invariably objects to new wholesale licenses. In re Application of Kasser Distillers Corp. (A.B.C. Bulletin 1720, pp. 7, 9, January 10, 1967). The record does not show how much was spent on the campaign to pass the legislation now in question, but the authorization to spend has already been noted and as an amusing footnote to a temperance discussion the record shows that the Association issued its check for $2,000 to a Trenton restaurant to pay for alcoholic beverages. If handsome profits have been the rule, a distiller who enlarges his business by adding a wholesaler-to-retailer distribution department may be satisfied to have that department earn lower profits on its activities than the rate which independent wholesalers have generally been earning, and he may be able to cut costs of this stage of the distribution process by developing greater efficiency than the independents have shown. This potential for lower consumer prices is only slight, however, and the area for price changes at its greatest scope would be small because the wholesaler-to-retailer distribution of alcoholic beverages is only a segment of the business of manufacturing and selling.
*477 A classical economist would teach that a reduction of only one cent in the price of a bottle of whiskey, brand A, will result in more sales than if the reduction had not been made, assuming that all other circumstances affecting sale are the same. That is not the point, however, and for two reasons. If a few more bottles of brand A are bought by consumers who otherwise would have purchased brands B or C, that has nothing to do with the cause of temperance. Distillers from time to time do change the filed retail prices of the brands they own or control, thus creating some degree of price appeal for one brand over others; and this is an accepted feature of our system. Secondly, it is pointless here to consider the effect of free liquor upon consumption, or even liquor at some point below cost. Economic factors bar Schenley, or any other distiller, from giving away its beverages and from selling below or at cost, or at any scale of prices that will not produce over all a profit on capital and effort devoted to the whole business. Then there is a legal barrier: on March 27, 1967 the Director of the Division of Alcoholic Beverage Control issued a warning in writing to licensees having the privilege to sell to retailers. He warned them that a sale to a retailer for less than cost would be a violation of Rule 11 of State Regulation No. 34 (adopted at an earlier date) and might result in disciplinary proceedings against the offender's license.
Grand Union's approval of the statute to prevent the spread of chain operations in liquor retailing was based in part on the proposition that a legitimate object of the legislation was to make consumers pay more than they might otherwise have to pay and thus reduce consumption. However, the price comparisons mentioned in the opinion (43 N.J., at p. 396) were between brands generally advertised and distributed and chain stores' private brands selling at one-third less  a substantial price differential. In the present case, unless the licensed jobbers have been receiving lush profits or operating inefficiently, or both, no distiller's wholesale-to-retail department can really do anything about *478 getting prices for that level of the liquor business down, for at best it can only be operated efficiently and at a reasonable profit.
I conclude that the potential of chapter 58 for keeping prices up is uncertain, and if present at all could operate within such a small range as to produce a price-affecting factor so slight that the statute cannot be held to be a reasonable exercise of the police power on price-control grounds. The alternative would be to protect by legislation prices which are possibly subject to some reduction through competition only because they reflect inefficiency or excess profits.
Though not necessary to the decision just stated, I should add that on the subject of prices I found convincing the testimony offered for plaintiff to the effect that price reductions do not appreciably increase consumption. The witnesses addressed themselves to price reductions within commercially available ranges and did not go into unrealistic discussion about free liquor or liquor priced below cost. Feldman, president of Schenley Industries and a former vice-president in charge of marketing for the company, testified to his personal experience as the proprietor of a chain of 17 liquor stores in Florida when the "fair trade" price-fixing system in that state came to an end. There was at first a flurry of buying when prices went down but thereafter the volume of sales went back to the same level as it had been before price-fixing came to an end. Dr. Harold Wattel, Professor of Economics at Hofstra University and a specialist in the economics of the liquor industry with an impressive record of studies and publications, also testified that price reductions to the consumer do not increase individual consumption. This conclusion has been demonstrated by investigation. One result of a lower retail price level is a tendency to shift to a brand which formerly was regarded as beyond the buyer's budget. This factual material strengthens my conclusion that any price reduction which could possibly result from successful operation of a *479 wholesale-retail department in New Jersey by Schenley would not foster intemperance.
Another argument for validity is that the legislation is an appropriate extension of our established policy against "tied houses." Dr. Wattel expressed doubts about the real worth of the policy under today's conditions, but whatever the merit of his views on the subject, a prohibition against "tied houses" to the extent of keeping manufacturer and wholesaler out of the retail business is an established and accepted part of our scheme of regulation. In Grand Union our "tied house" policy was among the factors mentioned in justification of the legislation forbidding the growth of chain outlets for sale of alcoholic beverages at retail. Until chapter 58 was passed our forbidden "ties" always involved a retailer.
At the center of the "evil" thus prohibited is the direct relationship between producer or wholesaler on the one hand and consumer on the other. The policy has been to keep producer and wholesaler out of a position in which either might serve, or sell directly to, the patron of a retail establishment owned or controlled by the producer or wholesaler and use this direct relationship to persuade that patron to drink or buy more than a temperate man should. I think the "tied house" argument made in the present case is nothing more than an assertion that the policy is accepted and established where a direct relationship with a consumer is involved and may be, for that reason and no other, extended to levels of the alcoholic beverage industry where no consumer relationship is involved, or at least extended for the purpose of keeping producers who have not previously sold directly to retailers from doing so in the future.
Plaintiff for a long time has had a plenary wholesale license even though (except for private brands) its sales in the past have been to other wholesalers. One of the main purposes of having such a license, if not the main purpose, has been to make it lawful for plaintiffs' sales representatives to call on retailers and promote Schenley products in any *480 way available to salesmen short of actually making sales. This sort of selling effort has been a general practice in the industry. It is not prohibited by the 1966 amendments and no doubt will continue as a business device. Through plaintiff Schenley has been and will continue to be in direct contact with retailers. I see nothing about direct selling by producer to retailer that might threaten to bring about more intemperate drinking habits than would prevail if the direct selling were prohibited; the consumer will have no more contact with the producer than he does now. With a group of salesmen devoting their attention exclusively to the Schenley line and actually taking orders from retailers, plaintiff may (or may not) be successful in persuading retailers to purchase more Schenley products. Such success, if attained, merely puts bottles on the shelves and probably displaces the bottles of other producers, but it does not get Schenley's beverages into the hands of the consumer. The retailer will have to do that on his own just as he does now. Advertising in various forms is used extensively now by distillers and its use will go on. Holding this legislation valid would not change that.
Legislation prohibiting a distiller from owning or controlling a cork-making shop or a label-printing plant would not be taken seriously as an extension of the "tied house" policy. Neither of those divorces would have any sensible relation to the cause of temperance or to any of the other objectives of our system of controls. In my judgment the provisions of chapter 58 which block a producer from operating a wholesale-to-retail sales agency in New Jersey, though more plausible as a "tied house" extension than the cork and label example, are not truly an application of the principles of that doctrine. Insofar as this ground of argument for the legislation involves more than the pricing contentions which have already been considered and rejected, I conclude that merit is lacking.
Before leaving the subject of due process it must also be asked whether there is a possible public benefit in protecting *481 the members of the Association and other independent wholesalers against competition by Schenley or any company similarly situated, and whether this benefit, if it exists, would justify the legislation. I think the answer to the question must be negative. Our alcoholic beverage industry is in private hands. It is basic with us that, though subject to controls, it be competitive, not monopolistic. Competition per se is not an evil. Though there may be too many bars for the reasonable needs of a given community, the essence of the evil there is the excessive number, and for proper correction there should be a reduction to a point where reasonable competition will be restored. We have no excessive competition at the wholesaler-retailer level. The numbers already mentioned and the heavy concentration of the business in the hands of a few licensees show that. There is no public good in sheltering a small group of licensees from the competition which our system dictates they should face. The ruin predicted by the Association is nonsense and for a court to take any stock in it would be to depart from business realities.
Schenley has a history of distributing its products in New Jersey through jobbers. Apparently other major distillers have followed the same practice. That history shows that there is no magic in shifting to a plan of distribution by which a distiller sets up a department to sell at wholesale to retailers. If there were, the distillers would have all shifted to such a plan long ago. The new department will simply be another competitor for the jobbers and will have to justify itself economically by selling the distiller's beverages and earning distribution costs and a distributor's profit. There will be nothing really different or special about the competition furnished by Schenley at the wholesale-to-retail level, and Schenley may have no great success against the well-established trade positions of the members of the Association. As a device to stifle competition the statute is objectionable because there is no "evil" to be suppressed or controlled. It is not unusual for manufacturers of alcoholic *482 beverages and other products to distribute to retailers through jobbers and to distribute to retailers through direct factory branches. The same manufacturer may use both methods, or in a particular industry one manufacturer may use one method and a competitor use the other. There is nothing wrong or even unusual for both methods to exist side by side in the same industrial field.
My ultimate conclusion on the issue of due process is that chapter 58 of the Laws of 1966 does not represent a proper exercise of the police power of the State. The restrictions which it purports to impose upon plaintiff's business activities do not bear a reasonable relationship to the proper objectives of our general scheme of alcoholic beverage control, and if it could be said that there is any "evil" aimed at by the statute (and I judge there is not), the means of regulation provided are not reasonably designed to that end. Jones v. Haridor Realty Corp., 37 N.J. 384, 391-392 (1962); George Benz Sons v. Ericson, supra.
Plaintiff also contends that chapter 58 violates the equal protection clause of the Federal Constitution and conflicts with the provisions of the New Jersey Constitution, Art. IV, § VII, pars. 7, 8 and 9(8), limiting the power of the Legislature to pass private, special and local laws. For the purpose of discussing these contentions I will assume that the legislation is otherwise valid.
Equal protection has for a long time been a notoriously weak ground on which to argue unconstitutionality, e.g., Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). Chapter 58, however, contains provisions which produce flagrantly arbitrary and unfair classification, leading me to the conclusion that the equal protection clause of the Federal Constitution has been violated. Some discussion of the statute will be needed to explain this conclusion.
As noted, Senate Bill 356, which became chapter 58 of the Laws of 1966, is in form an amendment of R.S. 33:1-43. The new material inserted in section 43 by the amendment was designed *483 by its draftsman to make it unlawful for only some producers to sell at wholesale to licensed New Jersey retailers. Distillers and their subsidiary sales corporations, if they hold New Jersey licenses at all, hold (as plaintiff does now and did on the effective date of the statute) Class B licenses under N.J.S.A. 33:1-11 and, more specifically, plenary wholesale licenses under subdivision 1 of Section 11, which reads in part as follows:
"The holder of this license shall be entitled, subject to rules and regulations, to sell and distribute alcoholic beverages to retailers and wholesalers licensed in accordance with this chapter * * *."
If the new material inserted in section 43 by the 1966 amendment (chapter 58) is valid, then plaintiff's license and N.J.S.A. 33:1-11 no longer mean what they say. A workmanlike job of drafting the legislation of 1966 would have included a revision of section 11 to provide for a Class B license authorizing sales to wholesalers only, thus eliminating the impression gained from a reading of section 11 that any holder of a plenary wholesale license who meets the requirements of administrative rules and regulations is authorized by that license and by the section under which it has been issued to sell both to retailers and wholesalers. On the effective date of chapter 58 plaintiff's license had been paid for at the full annual rate of $3,000 and was, if statutory validity be assumed, cut down in scope without any reimbursement or compensation, although other holders of plenary wholesale licenses continued to enjoy the full scope of their licenses as provided in N.J.S.A. 33:1-11.
The amendatory language drafted to prevent Schenley from selling wholesale-to-retail obviously followed, up to a point, a restrictive provision which has been part of N.J.S.A. 33:1-43 for many years. That provision makes it unlawful for a brewer or other producer to be directly or indirectly interested "in the retailing of any alcoholic beverages * * *." It will be noted that this older provision refers directly *484 to the making of sales by use of the word "retailing" whereas the amendatory language of 1966 taken literally makes a relationship unlawful without regard to whether sales are made or not. The sweeping declaration in chapter 58 that it is unlawful for a producer of alcoholic beverages to have an interlocking relationship with a licensed wholesaler (who is selling to retailers), if otherwise valid and allowed to stand alone, would have spoiled the Schenley plans for wholesaler-to-retailer trade, but it also would have curtailed the activities of producers who previously had established a business practice of selling directly or indirectly from the wholesale level to retailers. To spare those producers (as may have been necessary to reduce political opposition) and at the same time block Schenley required the draftsman to do more than to include in the amending language a simple statement to the effect that "the foregoing shall not apply to any producer who has heretofore regularly engaged in the business of selling his products at wholesale to retailers." Plaintiff, as the sales agency of Schenley products, by 1966 had been engaged for some time in selling Schenley products to retailers. The sales had been of the so-called "private brands," and by regulation the prices of those products are not included in the official published wholesale price list issued by the Division of Alcoholic Beverage Control. That list contains a section for each licensed wholesaler, and under the licensee's name are the beverages offered for sale and the prices to be paid by the retailer. The wholesale price list which became effective January 1, 1969 is, for example, a thick book of 460 pages plus index, and may be compared to a joint catalogue of beverages being offered to retailers by a total of 60 licensed wholesalers. Plaintiff, prior to April 1, 1966, had never filed with the Director a listing of prices for sales from wholesaler to retailer  except insofar as there were listings of private brands  and the Director had not included in any wholesale price list published under State Regulation No. 34, Rule 6, plaintiff's name as a seller to retailers. As already mentioned, plaintiff did file on April 1, 1966 a list of products and prices *485 to be sold at wholesale to retailers, and this listing, having been objected to by the Association, was declared by the Director to have been untimely for the making of sales in the second quarter of 1966. On or before May 20, 1966, in good time for the third quarter of the year, plaintiff filed with the Director listings for sale at wholesale to retailers. There is no suggestion that this filing was not in all respects proper when made. Thus, the draftsman's aim to block Schenley and his desire at the same time to permit some other producers to continue to sell at wholesale to retailers were beyond attainment by a proviso exempting producers who, prior to the effective date of the act, had been selling at retail, and were equally beyond attainment by a proviso exempting all producers who had prior to the act filed wholesaler-retailer prices required to be published under Rule 6. The device hit upon has been called in argument the "grandfather clause." I repeat it here for convenience in discussion:
"* * * except that the foregoing [i.e., the entire general prohibition against wholesale-to-retail selling by a producer] shall not apply in the case of a licensee for the sale at wholesale who on July 1, 1965, and thereafter until the effective date of this act, shall have filed for publication by the Division of Alcoholic Beverage Control price listings for brands of alcoholic beverages pursuant to the rules and regulations of the Division of Alcoholic Beverage Control."
Questions based on the wording will occur to the reader. Does the reference to filing "on July 1, 1965" rule out exemption for a "grandfather" who filed on June 30, 1965 or some earlier date? The language calls for an affirmative answer, but surely that result was not intended. Knowing that the objective was to block Schenley, it can be assumed that the draftsman was thinking of the filing of price listings for sales to retailers, but he did not say so. State Regulation No. 34, Rule 2 recognizes that manufacturers and wholesalers may file official listings without being concerned with wholesale-retail prices. The rule reads in part:
*486 "Manufacturers and wholesalers selling to both wholesalers and retailers shall file separate listings of prices and discounts to wholesalers and retailers."
Schenley had regularly filed, and for publication, price listings of its brands governing sales to consumers. Did it therefore qualify for exemption? That was the last result intended by the draftsman, yet he failed to spell out that filing of wholesale-to-retail prices would be the making of a "grandfather."
Plaintiff cites and relies upon Alexander v. City of Elizabeth, 56 N.J.L. 71 (Sup. Ct. 1893), and Inhabitants of City of Burlington v. Pennsylvania R.R. Co., 56 N.J. Eq. 259 (Ch. 1897). In Alexander the court held a statute (passed February 27, 1893) unconstitutional which treated race tracks used before January 1, 1893 much more favorably than race tracks to be set up after that date, saying in its opinion:
"Now, it is manifest that this provision of the statute operates to create such a classification as not to confer upon all race courses alike the benefit which inures from the exercise of the powers under the first section of this act. The act creates and confers privileges upon one class of race courses and grants to certain corporations, associations, and individuals privileges and immunities which can be rarely, if ever, conferred upon others under its provisions. The conditions imposed are not even similar. One class of race courses may be established without regard to conditions at all; another class can only be established by submitting to the imposition of a condition which may be either of difficult or impossible performance.
One class is privileged to the point almost of monopoly, and the other class is discriminated against almost to the point of absolute prohibition; and this is a vice of statutory enactment declared against and plainly interdicted by the provisions of the constitution against the passage of local or special laws granting to any corporation, association, or individual any exclusive privilege, immunity or franchise." (at p. 82)
The problem and ruling in Burlington are stated in this excerpt:
"But the other grounds upon which the statute is attacked possess more substance It is perceived that the power to enter into *487 contracts with railroad companies upon which the municipality grants the right to construct tracks along streets of cities is limited by the statute to cities within which railroads were already constructed, or a route was already located, at the time of the passage of the statute. The effect of the legislation is to exclude from participation in the power conferred any city in which a railroad route shall be located after the passage of the act. Now, it is impossible to conceive how a city in which a route may have been filed after April 9th differs from a city in which a route was filed before April 9th, in respect to the condition which called for the legislation. The propriety or necessity for the existence of the power to contract would be exactly the same whether the route has been or shall be filed. The legislature cannot confine the force of its enactment to the condition of affairs existing at the date of the act, if similar conditions are likely to arise thereafter." (at p. 263)
Much more recently it was held that an attempt to make sanitary regulations applicable to future trailer camps and exempt existing camps was a denial of equal protection. Zullo v. Board of Health, 9 N.J. 431 (1952). The only justification for exemption of preexisting selling under chapter 58 appears to be the possibility of some economic loss to the producers of alcoholic beverages who, before July 1, 1965, were doing their own wholesale-to-retail selling. But if the "evil" here were even a small fraction of that outlined in arguments for statutory validity, the cost of turning over a sales department to an independent wholesaler would seem relatively negligible and not an acceptable basis for classification.
Valid "grandfather" clauses which use past business experience or practical training as a substantial equivalent of the examination or license requirements imposed upon the new entry into the field, are not precedents here. Independent Electricians etc., Contractors Ass'n v. N.J. Board of Examiners, etc., supra; McCracken v. United States, 47 F. Supp. 444 (D. Or., 1942). An existing wholesaler-to-retailer business of an alcoholic beverage producer would have exactly the same effect upon the public interest as one which might be launched tomorrow.
There is, however, a particularly objectionable feature of the "grandfather" clause of chapter 58. As written it has the effect of creating three classes: (a) the distillers and *488 other producers selling at wholesale to retailers on and since July 1, 1965; (b) those not doing so who could have been reached by a straightforward provision applicable after the effective date of the act but not back-dated, and (c) plaintiff, which had made its plans, made investments of time and money, had filed a price list and in fact would have been actually operating a wholesaler-to-retailer department in the spring of 1966, before passage of chapter 58, if its interim filing had not been blocked by what seems to me an erroneous response by the Director to the objections of the Association. The provision of chapter 58 which purports to make exemption depend upon filing of price lists on July 1, 1965 was tailor-made to fit plaintiff, is offensive to a sense of fairness and unduly discriminatory. In a word, it is invidious. Grand Union, 43 N.J., at p. 405.
I conclude that chapter 58 of the Laws of 1966 is invalid under the equal protection clause of the Federal Constitution and under applicable provisions of the New Jersey Constitution, Art. IV, § VII.
It is noteworthy also that chapter 58 could produce results so curious as to cast serious doubt on the rationality of the purported classification. If plaintiff, or any other beverage producer or its subsidiary, should buy a controlling stock interest in a licensee which was carrying on a wholesaler-retailer business on July 1, 1965, the "tied" relationship thus created would not be touched by the statute. With 60 licensees selling to retailers in the State it should be simple enough, and even quite likely, for a distiller to buy one in order to get into the business of selling to retailers. If a wholesale business started since July 1, 1965 should have enough success to make business life uncomfortably competitive for others, it could be abruptly terminated by having a distiller acquire a share of its stock.
The provision against producer ownership or control of a licensee selling at wholesale to retailers purports to be balanced in chapter 58 by a prohibition against ownership or control by such a seller of any winery, distillery or rectifying *489 and blending plant, or wholesaling or importing interests of any kind "outside the State." This portion of chapter 58 also has a back-dating grandfather clause, and if plaintiff acquired an ownership interest in a winery or distillery outside New Jersey between July 1, 1965 and the effective date of chapter 58, that ownership was declared ex post facto to be unlawful; to the contrary if the ownership interest acquired was in a winery or distillery inside New Jersey. I do not understand the distinction between "outside the State" and inside the State. Can a state legislate in a way to compel a group which is likely to invest in the alcoholic beverage business to make its investments at home or not at all? Or is this a sort of device which can be defended because it keeps a relationship which is properly subject to regulation within the jurisdiction? I have not undertaken to answer those questions because plaintiff's situation does not bring it into conflict, or threaten conflict at present, with this portion of chapter 58. Here, too, of course, there is the same sort of offensive, retroactive, grandfather clause, and this entire part of the statute by its terms applies to all wholesale licensees and is not limited, like the earlier part, to licensees selling at wholesale to retailers.
I find no merit in plaintiff's argument that the legislation conflicts with the interstate commerce clause of the Federal Constitution. That clause has only a limited bearing upon regulation of the alcoholic beverage industry.
Should an appellate court reject my views on the constitutional questions, that would still leave the problem of statutory construction. Specifically, have the price listings regularly filed by plaintiff for publication been enough to give plaintiff the benefit of the "grandfather" clause? The legislation does not expressly require price listings at the wholesale-to-retail level, but I think it should be so construed. We know the intent: it was to block Schenley. That intent justifies a construction which will produce the result even though clear language was not used. It is unnecessary to look beyond two recent cases for a warrant to interpret and *490 construe freely: Roman v. Sharper, 53 N.J. 338 (1969); Jackson v. Concord Co., 54 N.J. 113 (1969).
Plaintiff also attacks chapter 59 of the Laws of 1966, N.J.S. 33:1-93.6, but has shown no specific conflict between that statute and plaintiff's actions or plans. In those circumstances I think it inappropriate to pass upon the validity of chapter 59 and will not undertake to do so.
There will be a judgment declaring chapter 58 of the Laws of 1966 unconstitutional.